422 So.2d 123 (1982)
STATE of Louisiana
v.
Lewis T. GRAHAM, Jr.
No. 81-KA-3328.
Supreme Court of Louisiana.
October 18, 1982.
Rehearing Denied December 10, 1982.
*127 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Paul Carmouche, Dist. Atty., Dale G. Cox, Asst. Dist. Atty., for plaintiff-appellee.
Bobby D. Sutton and Glenn Walker, Shreveport, for defendant-appellant.
DENNIS, Justice.
On March 31, 1980, Kathleen Graham was beaten to death with a sledgehammer while she slept in the bedroom of her home in Shreveport. Living in the home at the time of Mrs. Graham's murder were her husband, Dr. Lewis T. Graham, Jr., who shared the master bedroom with her, and three minor children, who slept in nearby bedrooms.
About 5:00 a.m., Lewis T. Graham, Jr. called the Shreveport Police Department and advised an officer that intruders had broken into his home and severely injured his wife. Dr. Graham also called a neighbor across the street, who in turn called another neighbor. The second neighbor went immediately to the Graham home and found Lewis Graham in the front hallway. He saw liquor bottles scattered over the den floor. Also on the floor was a set of binoculars that had been removed from its case. Dr. Graham and the neighbor went to the rooms of each of the children and woke them from their sleep.
The police arrived a few minutes later, and an officer kicked down the locked door of the master bedroom and entered. He saw Kathleen Graham lying on her back on the left side of the bed. Her face was covered with blood. Also, blood was present on the ceiling, walls, bedspread and linen, and carpet. A sledgehammer and a knife lay on the floor on the left side of the bed. The carpet on the left side of the bed was stained with blood. Much blood was present on the right side of the bed itself. Lewis Graham had blood on the front and back of his tee-shirt and the front of his undershorts. The shower, tub, and lavatory in the master bedroom were wet and the lavatory contained blood.
The overhead garage door was found partially raised. The door leading from the garage to the kitchen was found pulled to, but not closed because the dead-bolt was extruded. Scuff marks appeared on the door facing. A crowbar was found on the garage floor. A can of coins and a flashlight were found on the driveway leading into the garage. The hammer, knife, crowbar, flashlight and coins all belonged to the Grahams.
Police officers found no sign of forced entry. Several neighbors of the Grahams had been home all night and heard nothing unusual. However, two neighbors stated that their dogs had awakened them during the night of the murder.
The coroner revealed the cause of Kathleen Graham's death to be blunt head trauma caused by an instrument consistent with the sledgehammer found in the bedroom. A forensic pathologist testified that Mrs. Graham had sustained at least four blows to the top of her head with a sledgehammer while she was lying on the right side of the bed as it would appear to a person standing at the foot. These blows were struck in rapid succession and rendered her unconscious and incapable of voluntary movement. She did not die immediately but lived for some fifteen to thirty minutes after the first blows. After she was beaten on the right side of the bed, Mrs. Graham was moved onto her back on the left side of the bed as viewed from its foot, where she received what the expert considered to be the final blow, a massive blow to her forehead also delivered with the sledgehammer.
Lewis Graham was not seriously injured. He sustained the following wounds: an abrasion on his forehead; a cut across the entire palm of his left hand which required no treatment; and an incision type wound on the flank underneath his left arm which required one stitch.
*128 On the morning of the murder, Lewis Graham recounted the following version of facts to the Shreveport police:
His wife woke him between 2 and 3 a.m. hearing noises. Dr. Graham checked in several rooms of the house but found all the doors closed and nothing unusual. He returned to the bedroom and set his alarm clock for a time close to 5 a.m. so that he could study. He placed the clock on the floor. He got into the left side of the bed and fell into a deep sleep. He next remembers the bed lurching or shaking. He heard a scream and was pushed or pulled from the bed. He felt more than one person was handling him and felt a sharp pain under his left arm. A brief struggle took place. He was then thrown across the room where he fell on his stomach and lay unconscious. He was unable to describe anything about his assailant(s), although he felt that there were probably two of them.
When Dr. Graham awoke he was on his stomach. He turned on the bedroom light and saw a horrible scene, knowing immediately his wife was probably dead. He went to the bathroom to see how badly he had been hurt. He noticed the blood on his shirt. He then turned the bedroom light off and locked the master bedroom door so that his children would not see this horrible scene. He proceeded to the kitchen where he looked up the number of the Shreveport Police, called them and then a neighbor, Mrs. Godwin. She in turn called another neighbor, Mr. Siragusa. Dr. Graham put on his pants which were located in the family room, turned on the porch light and waited for the police to arrive. Mr. Siragusa arrived before the police and they, Dr. Graham and his neighbor, then checked on the children. He sent the children across the street. He noticed some cabinet doors opened in the den and liquor bottles strewn on the den floor.
On several subsequent occasions, including during his testimony at trial, Dr. Graham related his version of the events surrounding his wife's death which, except for a few inconsistencies, substantially tracked this first statement.
The Northwest Criminalistics Laboratory performed certain tests on physical evidence seized from the Graham residence. The tests revealed the following: Kathleen Graham had blood type "A"; Lewis T. Graham, Jr., had blood type "O"; the sledgehammer was determined to have type "A" on it; the knife was determined to have type "O"; the blood on the bed linens was of type "A". The stain under the left arm of the defendant's tee-shirt was type "O"; the spatters on the front of the tee-shirt and the drips on the back and front of the right shoulder were type "A". The spatters on the defendant's undershorts were type "A". They concluded that the blood spattering the headboard of the bed, the lamp, the clock and various places was all human blood. Shreveport police identification personnel discovered a latent fingerprint impression on the handle of the knife which was matched to the defendant.
Mr. Herbert McDonnell, the state's blood spatter expert, examined the tee-shirt of the defendant and concluded that the stains on the front and back on the right shoulder of the shirt were consistent with the type of cast-off spatter found on the shirt of a person who has administered a beating with an object similar to a sledgehammer. He considered that the size and concentration of the blood stains on the front of the defendant's tee-shirt indicated that the defendant was within two to four feet of the victim at the time she was beaten. He identified what he considered to be wipe marks down the left side of the defendant's tee-shirt. Mr. McDonnell found blood which had coagulated before it was scattered by the sledgehammer's blow on the lamp and headboard of the bed and on the front of the defendant's undershorts. He testified that human blood coagulates in three to five minutes which would mean that a time period of three to five minutes elapsed between the two beatings of Mrs. Graham. Mr. McDonnell determined from the size and concentration of the blood spatters on the front of the defendant's undershorts that the defendant was within two to *129 four feet of the victim when the last beating was administered.
Mrs. Judith Bunker, the defendant's blood spatter expert, testified that the spots on the front of the defendant's clothing could have been minute particles of tissue. She further testified that she was unsure as to the coagulation time of blood, but that she would agree with whatever coagulation time was given by Mr. McDonnell, with whom she was acquainted. In a separate context, relating to the amount of blood lost by the defendant, Dr. Petty, a forensic pathologist, testified that coagulation times vary with individuals.
Defendant, Dr. Lewis T. Graham, Jr., was charged by indictment with the second degree murder of his wife. A Caddo Parish jury convicted the defendant as charged by a vote of 10-2 and the trial judge sentenced him to life imprisonment. He moved for a new trial on several grounds and for a motion in arrest of judgment, but the trial judge overruled all of his motions. In this appeal, the defendant makes fourteen assignments of error. Because we find that each of his assignments is without merit, we affirm the defendant's conviction and sentence.

1. SUFFICIENCY OF EVIDENCE (ASSIGNMENT NO. SEVEN)
Defendant contends that the evidence is constitutionally insufficient to support his conviction because all of the evidence was circumstantial as to his identity as the killer and did not exclude every reasonable hypothesis of his innocence. We conclude that this assignment is without merit. The hypothesis of innocence advanced by the defendant is not a reasonable one.
The Due Process Clause of the Fourteenth Amendment requires this court to review the evidence upon which a criminal conviction is based to determine whether it is minimally sufficient. A defendant has not been afforded due process, and his conviction cannot stand, unless, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Additionally, we are governed by our statutory rule as to circumstantial evidence: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. R.S. 15:438.
In previous opinions we have attempted to formulate a single precept incorporating both standards. See, e.g., State v. Austin, 399 So.2d 158 (La.1981). ("Therefore, when we review a conviction based upon circumstantial evidence we must determine that, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have concluded beyond a reasonable doubt that every reasonable hypothesis of innocence had been excluded." Id. p. 160). Upon further reflection, however, a merger does not appear to promote clarity but could lead to a distortion of the standards. A combination of the rules may incorrectly imply that, when all of the evidence of the defendant's guilt is circumstantial, due process requires more than evidence which would satisfy any rational juror of proof of guilt beyond a reasonable doubt. On the other hand, an in-tandem articulation may seem improperly to diminish the requirement of the circumstantial evidence rule by implying that, in a close case, this court will defer to the jury's finding rather than follow its own determination of whether there is a reasonable hypothesis of innocence. Although in many instances separate and dual applications of the rules will yield the same result, out of an abundance of caution we will proceed to apply each standard separately, as it was given to us by the framers.
The characterization of evidence as "direct" or "circumstantial" points to the kind of inference which is sought to be drawn from the evidence to the truth of the proposition for which it is offered. If the inference sought is merely that certain facts are true because a witness reported his observation and the assumption that *130 witnesses are worthy of belief, the evidence is direct. When, however, the evidence is offered also for some further proposition based upon some inference other than merely the inference from assertion to the truth of the fact asserted, then the evidence is circumstantial evidence of this further fact-to-be-inferred. McCormick, § 185 p. 435. In the present case, although direct evidence was introduced to prove that the victim was murdered in her bed with a sledgehammer while the defendant was present, it qualifies only as circumstantial evidence of the crucial fact-to-be-inferred, i.e., that the defendant was the killer.
One hypothesis of innocence is suggested by defendant's arguments and testimony: Two or more intruders entered the Graham house on the night in question without awakening the Grahams or their three children, escaping the attention of the Grahams' dog, and leaving only questionable signs of forcible entry. They picked up a sledgehammer and a knife in the house and proceeded to the main bedroom where the Grahams were sleeping. One or more of the intruders seized the defendant while another beat his wife's head with a sledgehammer. At this time, the front of the defendant's tee-shirt and shorts were spattered with his wife's blood. During a brief struggle, the defendant received a small one-stitch wound from the knife, and was rendered unconscious when he was thrown against a wall. The intruders decided not to molest him anymore but continued to savagely beat his wife's head. Because the defendant came to rest face down he received blood spatters on the back of his tee-shirt and shorts in addition to that on the front. During or after the sledgehammer murder one or more of the intruders took a can of coins which defendant said contained $150 in dimes, but later the can was discarded in front of the house. They also scattered some bottles of liquor across the den floor and tampered with a set of binoculars. The murderers overlooked or were not interested in several items of value such as Mrs. Graham's diamond ring and an antique pistol. They departed without being seen by anyone, even the defendant who was unable to describe them, without disturbing or awakening any of the three children, and again without being detected by the family dog.
We do not think this is a reasonable interpretation of the situation, assuming every fact to be proved that the evidence tends to prove. The odds are heavily against the coincidence of the series of unlikely events upon which the hypothesis depends. The possibility that the murder occurred in this way is reduced further by the facts inconsistent with defendant's theory which the evidence also tends to prove. In comparison with the prosecution's hypothesis of defendant's guilt, which is consistent overall with the evidence, the defendant's circumstantial theory of innocence is remote.
Severally, the events of the defendant's hypothesis are each unlikely: A forcible yet silent, almost traceless entry by two unidentified and undescribed intruders; a heinous sledgehammer murder of a woman in her sleep by selective killers who had little malice toward her husband and none toward her children; a fortuitous manipulation of defendant's torso during the slaying that gave him the bloody coating of a murderer; a highly selective burglary by criminals who preferred dimes to other more precious valuables; a trackless disappearance of villains seen only by defendant, who silently, efficiently committed their bizarre crime with implements they discovered at the house and left no clues to their identities behind. The odds against all of these events taking place in one criminal transaction are extremely high.
The hypothesis of defendant's innocence conflicts with several of the facts which the evidence tends to show. According to the state's expert witness, the cast off blood stains on defendant's shoulders were not consistent with his asserted facedown reclining position but were consistent with his guilt. The same expert's testimony tends to prove that there was coagulated blood on the front of defendant's underclothes which could not have been obtained consistently with defendant's story but which was consistent with his guilt.
*131 There were many other details which were more fully consistent with the prosecution's theory than with a hypothesis of innocence. The blood spatters on defendant's shorts were denser than those on his tee-shirt, indicating a greater likelihood that he was standing when the spatters occurred. The blood spatters on both front and back of defendant's clothes were totally consistent with his role as the murderer. According to the state's experts no one's fingerprints but the defendant's were found on the knife. Although defendant claims he was cut with the knife before being thrown face down there was no blood at the place he said he landed. There were transfer patterns on defendant's tee-shirt consistent with the wiping of blood from an instrument such as a knife, although it could not be said conclusively that it was caused by the knife in the instant case.
Consequently, we conclude that, assuming every fact that the evidence tends to prove, the evidence excludes every reasonable hypothesis of innocence. For all of the reasons expressed, we further conclude that defendant was not denied due process of law and that this conviction is clearly based upon evidence from which, when viewed in the light most favorable to the prosecution, a rational juror could find that the essential elements of defendant's crime had been proved beyond a reasonable doubt. Thus, the evidence is both constitutionally and statutorily sufficient to support the defendant's conviction.

2. JURY EXPERIMENT (ASSIGNMENT NO. ONE)
Defendant contends that the trial court committed reversible error in denying his motion for a new trial based upon an independent blood coagulation experiment by several jurors during their deliberations. We conclude that this assignment is without reversible merit because there is not a reasonable possibility that the juror's experiment affected the verdict.
According to evidence educed by the defendant, after the case had been submitted to the jury one of the jurors, in the presence of four others, pricked his finger and determined that it took four and one-half minutes for his blood to coagulate. The experiment occurred at about 1:30 a.m. in a hotel room where the five jurors had continued to discuss the case after earlier jury deliberations from 5:20 p.m. to about 12:00 p.m. had ended without a verdict. The next morning, which was Sunday, the jury began deliberations shortly after 8:15 a.m. and by 9:00 a.m. reached a verdict of guilty by a 10-2 vote.
Our law provides that the jury shall be sequestered during its deliberations, after the judge delivers the charge, so as to be secluded from outside communications. La.C.Cr.P. art. 791. The purpose of sequestering jurors is to protect them from outside influence and from basing their verdict upon anything other than the evidence developed at trial. State v. Marchand, 362 So.2d 1090 (La.1978); State v. Hunter, 340 So.2d 226 (La.1976); Turner v. Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965). See also C.Cr.P. at 793 (relative to the use of evidence in the jury room).
Accordingly, a juror who considers evidence not developed or admitted at trial violates his sworn duty and may be guilty of misconduct. Under our statutory law, however, no juror is competent to testify to his own or his fellows' misconduct or to give evidence to explain, qualify, or impeach any indictment or any verdict found by the body of which he is or was a member. R.S. 15:470. Nevertheless, it is now clear that the statute must yield and that our courts are required to take evidence upon well pleaded allegations of prejudicial juror misconduct violating an accused's constitutional right to due process, to confront and cross-examine witnesses or to a trial by a fair and impartial jury and to set aside the verdict and order a new trial upon a showing that a constitutional violation occurred and that a reasonable possibility of prejudice exists.[1]Durr v. Cook, 589 *132 F.2d 891 (5th Cir.1979), vacating State v. Durr, 343 So.2d 1004 (La.1977). Because the accused is not required to show actual prejudice, the state may legitimately invoke the prohibition of R.S. 15:470 to bar inquiry into the mental processes of an individual juror. Cf. State v. Wisham, supra; State v. Marchand, supra; State v. Abney, 347 So.2d 498 (La.1977).
In the present case, the trial judge correctly followed the law at the new trial motion hearing by taking evidence upon the allegations of unconstitutional and prejudicial juror misconduct. He also correctly excluded any evidence of actual effect or prejudice upon the jury deliberations. Finally, he ruled correctly in our opinion that it had not been shown that a reasonable possibility of prejudice existed.
The problems presented by an experiment conducted by jurors on their own defy precise, systematic analysis. A juror is expected to draw upon his general knowledge and experience in deciding the case, and he is encouraged to participate in full and robust debate and deliberations with his fellows in reaching a verdict. However, he should not consider facts relating to the case unless introduced at trial under constitutional and legal safeguards. State v. Sinegal, 393 So.2d 684 (1981). Accordingly, when a juror passes beyond the record evidence in reaching a decision, whether a new trial will be granted depends upon the magnitude of the juror's deviation from his proper role, the degree to which the accused was deprived of the benefits of the constitutional and statutory safeguards, and the likelihood that the impropriety influenced the jury's verdict. All of these elements must be weighed in determining whether there is a reasonable possibility that the defendant's right to a fair trial has been prejudiced.
The jurors' experiment in the present case does not represent a radical departure from our expectations that a juror will employ his own ordinary experience in the deliberations. Any normal human being will experience his share of childhood scrapes, razor nicks, blood test pricks and various other episodes producing practical knowledge of blood coagulation. To say that a juror could not pass a fraction of an inch beyond the record to recall and employ this type of practical knowledge in his deliberations is to ignore centuries of history and the true function of the jury. Cf. United States ex rel Owen v. McMann, 435 F.2d 813 (2d Cir.1970), cert. denied 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646. Although the juror's experiment in this case cannot be classified as proper conduct, it was performed within the jury room and dealt with a subject well within the experience and practical knowledge of all jurors. As contrasted with other cases, it did not involve jurors conducting tests of matters beyond their normal ken or going outside the jury room to obtain esoteric knowledge or special information pertaining directly to the case. See e.g. State v. Sinegal, supra; Durr v. Cook, supra. Consequently, the danger that the jurors' common sense would be overcome by the experiment's instructive or dramatic effect was well tempered by an average juror's practical experience with blood coagulation.
The jurors' timing of blood clots on a pricked finger did not deprive the defendant of the benefits of constitutional and legal safeguards to the same extent as other tests described in reported decisions. The experiment here did not depend heavily on the jurors' powers of observation or on the reliability and credibility of a juror's report upon phenomena observed outside the jury room. Cf. Durr v. Cook, supra. Consequently, the loss of an opportunity to confront and cross-examine those who conducted the experiment was not as potentially prejudicial to the defendant. Furthermore, the rules of evidence would not necessarily have barred the introduction of the blood clot test evidence in this case. Demonstrative evidence offered for its circumstantial *133 value may be admitted within a broad discretionary power of the trial court to weigh the probative value of the evidence against whatever prejudice, confusion, surprise and waste of time are entailed. McCormick § 212, p. 527. Consequently, the practical benefits the defendant lost because he was not able to assert his constitutional and legal rights at trial with respect to the experimental evidence were not of crucial magnitude in this case.
The juror's experiment tends to corroborate the prosecution expert witness' opinion that human blood coagulates in three to five minutes. In our opinion, however, there is not a reasonable possibility that the jurors' experiment contributed decisively to the guilty verdict. In a different context another type of experiment could prevent a jury from recognizing a reasonable doubt or a reasonable hypothesis of innocence presented by the evidence. In the present case, however, there is no reasonable hypothesis of innocence and the evidence clearly supports a finding of guilt beyond a reasonable doubt even without the state's theory involving blood coagulation time. Moreover, the experiment in this case, when viewed in the context of the evidence presented at trial and the ordinary experience most persons have had with blood coagulation, does not appear to be so persuasive or dramatic as to skew the judgment of the jury or cause it to disregard the evidence presented at trial.
During the trial, Mr. McDonnell testified that human blood coagulates within three to five minutes. Based on this and his opinion that some of the blood on the defendant's clothes had coagulated before it was spattered on defendant, this expert witness expressed the opinion that defendant could not have received the blood spatters in the manner in which the defendant described the events surrounding the murder.
However, Mr. McDonnell admitted he had not tested the spots on the defendant's clothes to make certain they were from pre-coagulated blood. Mrs. Bunker cast doubt on his theory when she testified that the spatters could have been caused by particles of the victim's flesh mixed with blood which coagulates more rapidly than pure blood. Dr. Petty in giving testimony in relation to the coagulation of defendant's blood stated that the coagulation time of human blood varies with the circumstances of the case and the individual. On the other hand, there is even less blood coagulation evidence supporting the defendant's hypothesis of innocence. There was no affirmative evidence at trial whatsoever to the effect that the victim's blood could have coagulated with the rapidity necessary to fit within the defendant's account of the crime events.
When we weigh all of the evidence pointing toward defendant's guilt against the defense's unlikely hypothesis of innocence, including defendant's unusual story of how he got his wife's blood spattered on both the front and back of his underclothes, all of the evidence concerning blood coagulation time recedes in importance. Ultimately, the blood coagulation theory is not essential to the state's case. Furthermore, the juror experiment added virtually nothing to the theory. At most, it was cumulative to Mr. McDonnell's opinion about blood coagulation time. Since his opinion was not disputed at trial, the corroborative effect of the experiment was slight. We do not think Dr. Petty's testimony disputed the McDonnell opinion. He said that coagulation times can vary, but he was not asked about the three to five minute period as an average or normal time. Mr. McDonnell said that coagulation time for human blood is three to five minutes, but he was not asked if this interval could vary under any circumstances. In short, there was at most only a possible area of conflict between the two experts which was not explored or drawn into focus. On top of this, the whole foundation of McDonnell's coagulation theory was called into question by Bunker's testimony that defendant's clothes did not have precoagulated spatters and McDonnell's admission that he couldn't be positive that they did. In essence, the jury experiment was cumulative to a part of a state expert's testimony which was not disputed *134 at trial and which was not essential to a prosecution case that excluded every reasonable hypothesis of innocence and formed the basis for a rational finding of guilt beyond a reasonable doubt.

3. BAILLIF'S REMARK TO JUROR (ASSIGNMENT NO. 2)
Defendant contends that an unauthorized communication to the jury by its bailiff requires reversal because it was prejudicial to the accused. Midway through the trial, a bailiff told a juror that it would be up to the judge how long the jury would deliberate and it could be anywhere from five minutes to five days. An unauthorized communication to the jury by the bailiff requires reversal of the verdict, if the communication is prejudicial to the accused. State v. Marchand, 362 So.2d 1090 (La. 1978). Such a communication during trial is presumed prejudicial if it is about the matter pending before the court, Id., but here the matter was not about the case itself and thus the burden was on the defendant to prove that the incident was prejudicial. The trial judge ruled that the defendant had failed to carry this burden because the jurors were apprised during voir dire that the trial would be an extended one and were questioned at length on how this would affect their personal situations. The trial judge's impression was that the remark was harmless. It appears that the remark was offhand and casual, although somewhat careless. Its impact, if any, was lessened by the fact that it occurred several days before deliberations began. It was not totally inaccurate, since the deliberation time of the jury would have fallen within the range given. The trial judge was there; he saw and heard the witnesses. Our review convinces us that his judgment was reasonable. Accordingly, we find that this assignment lacks merit.

4. ALTERNATE JUROR PARTICIPATION (ASSIGNMENT NO. THREE)
Defendant contends that a prejudicial unauthorized communication occurred when an alternate juror expressed his interpretation of evidence presented at trial to a principal juror. This assignment is without merit. The episode occurred during trial before the alternate had been discharged. As we indicated in discussing juror experiments, a juror's duty to refrain from receiving evidence or communications not developed or admitted at trial serves the same purpose as sequestration, to protect him from outside influence and from basing his verdict on anything other than the evidence developed at trial. Consequently, under the circumstances, the jurors did not violate their duty. During the trial, an alternate juror has the same functions, powers, facilities, and privileges as the principal jurors. C.Cr.P. art. 789. Consequently, his communication to a principal juror before his discharge is not an outside influence, and the trial judge correctly refused to allow the jurors to testify regarding this subject pursuant to R.S. 15:470 because the allegations of misconduct did not state a cause to believe any improper or prejudicial event had occurred.

5. SUBPOENA DUCES TECUM (ASSIGNMENT NO. 4)
By this assignment of error, the defendant asserts that the trial court erred in quashing his subpoena duces tecum which requested that the state produce:
A copy of all offense reports, memoranda, or letters of citizen's complaints, and any and every other writing, communication and/or records of any and every residential and/or commercial or business burglary or attempted burglary or unlawful entry to such premises, including entry for purposes of rape, vandalism, theft, or any other purpose occurring between the dates of January 1, 1978 and March 31, 1980, within the area bounded by Live Oak Drive on the North, Kingston Road on the South and Mansfield Road on the West, Shreveport, Louisiana.
The state objected that the subpoena was unreasonably burdensome and oppressive. The state also asserted that the requested records might affect pending litigation, reveal the identification of confidential informants, *135 contain records of unfinished convictions and the arrest records of defendants and status offenders. The trial court quashed the subpoena but ordered the state to file into the record a monthly summary of burglaries for the police district in which defendant's home was located for the period requested by the defendant. The defendant objected, stating that he also wanted the burglary offense reports and statistics on other crimes that were listed in his subpoena.
Although the defendant was indicted on July 15, 1980, the Shreveport Police Department was not served with the subpoena until July 6, 1981 or approximately one week before the trial began on July 13. Two police officers testified at the hearing on the motion to quash that to comply with the subpoena would require approximately ninety days. One of the officers estimated that the cost of a manual search for the information would require $10,000.00 in overtime pay.
The defendant has a constitutionally guaranteed right to compulsory process. La. Const. art. I, sec. 16. However, the very statute upon which the defendant relies for his subpoena provides that "the court shall vacate or modify the subpoena if it is unreasonable or oppressive." La.C. Cr.P. 732.
In the present case, the subpoena was served upon the police department only one week before the scheduled trial. To accumulate the subpoenaed material would have taken almost three months and cost several thousand dollars. Given these facts, we do not believe that the trial judge committed reversible error when he quashed the subpoena as unreasonable and in its stead ordered the police to provide the defendant with a monthly summary of burglaries for the police district in which the defendant's home is located.
Therefore, this assignment of error lacks merit.

6. CONSTITUTIONAL ATTACKS (ASSIGNMENTS NO. FIVE AND SIX)
By this assignment of error, the defendant contends that the mandatory imposition of a sentence of life imprisonment at hard labor without benefit of probation, parole or suspension of sentence for second degree murder constitutes cruel and unusual punishment in violation of La. Const. art. I,§ 20 (1974) and the Eighth and Fourteenth Amendments of the United States Constitution. We have rejected this argument consistently. See, e.g. State v. Landry, 388 So.2d 699, 706 (La.1980); State v. Brooks, 350 So.2d 1174 (La.1977).
The defendant also asserts that the mandatory sentence unconstitutionally denies the defendant the right to have the trial court exercise its discretion in imposing sentences under La.C.Cr.P. arts. 893 and 894.1. However, we have recognized that the decision to assess mandatory life sentences for certain felonies is within the prerogative of the legislature. State v. Prestridge, 399 So.2d 564, 582 (La.1981).
The defendant further contends that the use of the non-unanimous verdict violates the Sixth and Fourteenth Amendments and Louisiana Constitution article I, § 16 (1974). We recently rejected such an argument in State v. Belgard, 410 So.2d 720, 727 (La. 1982). In doing so, we expressly followed decisions of the United States Supreme Court in its approval of the non-unanimous verdict in certain cases. See Johnson v. Louisiana, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972); Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972).
Accordingly, these assignments of error lack merit.

7. JURORS' RELIGIOUS SERVICES (ASSIGNMENT NO. 8)
By this assignment of error, defendant contends that the trial court erred in not allowing him to question two jurors regarding daily prayer services held by the jury foreman (who was a Presbyterian minister) for the jurors and the possible effect of such religious services upon the jury's deliberations.
*136 The policy behind our "jury privilege" statute, R.S. 15:470, is to preserve the confidentiality of the deliberation among jurors and to add to the finality of jury verdicts. State v. Wisham, 384 So.2d 385, 387 (La.1980). The privilege is not absolute and we have recognized that it must yield to a substantial showing that the defendant was deprived of his constitutional rights. State v. Sinegal, supra. Durr v. Cook, supra.
Defendant asserts that he was tried while the jury was charged with religious fervor. However, the record as limited by the trial court's application of the jury privilege does not support his contentions. Religious services among jurors do not amount to a substantial deprivation of constitutional rights necessary to overcome the prohibition against juror testimony. Voir dire is an opportune time to examine any religious attitudes which might adversely affect the defendant.
Accordingly, this assignment lacks merit.

8. JUROR PREJUDICE (ASSIGNMENT NO. NINE)
By this assignment of error, the defendant contends that the trial court erred in denying his motion for new trial based on the allegation that one of the jurors, Barney Burks, had a preconceived and unalterable opinion regarding defendant's guilt.
Specifically, the defendant alleges that the Juror Burks, when asked before voir dire why he did not claim his age exemption from jury duty, responded, "[Y]ou don't want to see that man [the accused] go free, do you?" It is also alleged that after the verdict of guilty, Burks told a newspaper reporter that "he was determined not to let Graham go free...." Finally, the defendant asserts that his defense was prejudiced by Mr. Burks' failure to reveal the fact that his daughter had committed suicide while her husband was at home with her and that he, Mr. Burks, attributed her emotional state and her death to her husband.
The trial judge ruled that Mr. Burks did not have a preconceived opinion. Mr. Burks testified at the hearing that he did not make either statement. The trial judge noted that Mr. Burks had been thoroughly questioned during voir dire for approximately an hour. Mr. Burks had testified that he would base his decision only on the evidence presented at trial. He testified that he agreed with the presumption of innocence and the burden of proof being on the state to prove guilt beyond a reasonable doubt. The trial judge observed that at least two other jurors should have heard the first statement, made before voir dire, and these witnesses did not testify at the hearing on the motion. The judge declared that the post-trial statement merely indicated that Mr. Burks was determined not to let the guilty defendant go free in light of all the evidence against him. On the issue of the deceased daughter, the trial judge noted that Mr. Burks was never questioned concerning any deceased children he might have. Thus, the failure of the prospective juror to reveal something which was not asked about did not amount to an effort to deceive the defendant.
We will reverse a trial judge's denial of a motion for a new trial only when that denial is an abuse of discretion. State v. Molinaro, 400 So.2d 596 (La.1981). In the present case, the trial judge was faced with conflicting testimony between Mr. Burks and several witnesses. The trial judge indicated doubts regarding whether the first statement occurred and offered a reasonable, constitutionally sound interpretation for the second statement. Additionally, the trial judge was convinced that the failure of Mr. Burks to declare that he had a deceased daughter was not a deception by Mr. Burks. We cannot say that the conclusions of the trial judge on this issue were incorrect.
Accordingly, this assignment of error lacks merit.

9. CUMULATIVE EFFECT OF ASSIGNED ERRORS (ASSIGNMENTS NO. TEN AND ELEVEN)
By assignment of error number ten, the defendant contends that the trial court erred in denying his motion for a new trial *137 based on the grounds set forth in previous assignments, specifically, numbers 1, 2, 3, 8, and 12. The only additional argument presented is that the combined effect of those assignments violated the defendant's right to a jury trial and traditional notions of fair play and due process.
By assignment of error number 11, defendant contends that the trial court erred in overruling defendant's motion for arrest on the grounds that the non-unanimous verdict and mandatory sentencing scheme are unconstitutional.
We previously addressed and rejected each of these contentions. Therefore, we will not discuss the merits of each assignment further. Furthermore, the combined effect of the incidences complained of, none of which amounts to reversible error, did not deprive the defendant of his right to a fair trial.
Accordingly, these assignments lack merit.

10. NEWLY DISCOVERED EVIDENCE (ASSIGNMENT NO. TWELVE)
By this assignment, the defendant asserts that the trial court erred in denying his motion for new trial based upon newly discovered evidence. Some two weeks after the conclusion of defendant's trial, defense counsel received a handwritten letter which purports to be a confession to the murder of Kathleen Graham.
The Code of Criminal Procedure, art. 851(3) provides for a new trial whenever:
New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence has been introduced at the trial it would probably have changed the verdict or judgment of guilty.
The ruling on a motion for a new trial is committed to the sound discretion of the trial judge and will be disturbed on appeal only when there is a clear showing of an abuse of that discretion. State v. Spell, 399 So.2d 551 (La.1981); State v. Manning, 380 So.2d 54 (La.1980).
At a hearing on the motion for a new trial, it was shown that the alleged writer of the letter did not agree with the way the trial was going, suggested to a co-worker that the co-worker write an anonymous letter, and admitted that he had been hospitalized in a mental institution.
Considering the foregoing dubious circumstances behind the writing of the letter, it is highly unlikely that if the letter had been introduced at the trial it would have changed the verdict of guilty. Thus, the trial judge did not abuse his discretion when he denied the motion for a new trial.
Therefore, this assignment of error lacks merit.

11. AUTOPSY PHOTOS (ASSIGNMENT NO. THIRTEEN)
By this assignment of error, the defendant asserts that the trial court erred in denying his motion for production of autopsy photographs of the victim as part of the coroner's proces verbal prepared pursuant to La.R.S. 33:1565. The trial court ruled that the photographs were not part of the proces verbal but that the defendant could utilize the criminal discovery articles to obtain the photographs. The defendant objected to the use of the discovery scheme and argued that forcing him to file a discovery motion caused him to be exposed to discovery reciprocity under C.Cr.P. art. 724 and accordingly forced him to surrender evidence to the state in violation of his Fifth Amendment rights.
Under our law a proces verbal refers to a written summary or report of facts. See, e.g. C.C.P. 2890. Thus, the trial judge was correct when he refused to hold the photographs as part of the coroner's proces.
However, the defendant argues that this application of our law to his situation deprived him of his Fifth Amendment rights against self-incrimination. The Fifth Amendment privilege against self-incrimination *138 applies only to evidence of a testimonial or communicative nature. Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1965). The limited reciprocal discovery rights given the state when the defendant invokes discovery provisions allows the state access to only evidence of a non-testimonial nature. See C.Cr.P. 724. Thus, the defendant's Fifth Amendment rights were not violated.
In the present case, the defendant received the actual report of the coroner, without photographs. To that extent, he received a benefit inasmuch as he was entitled to only the proces verbal.
In light of these facts, we conclude that the trial judge did not err when he ruled that the defendant could not have access to the autopsy photographs as part of the proces verbal.
Accordingly, this assignment of error lacks merit.

12. CONSTITUTIONAL ATTACK ON JURY SHIELD LAW (ASSIGNMENT NUMBER FOURTEEN)
By this assignment, defendant contends that La.R.S. 15:470, our jury privilege statute, is unconstitutional.
The Louisiana rule as embodied in La. R.S. 15:470 follows the general rule that "a juror's testimony or affidavit is not receivable to impeach his own verdict." 8 Wigmore, Evidence § 2345 (McNaughton ed. 1961).
In recent times, we have come to realize that the absolute language of the statute cannot be applied so as to deprive a criminal defendant of his constitutional rights. For example, in State v. Sinegal, supra, we reasoned that if the defendant presented a substantial claim that his constitutional rights had been infringed, the jury privilege cannot be used to bar testimony by jurors regarding their alleged improprieties. Our application of the jury privilege statute in this manner alligns with the Fifth Circuit's construction of the same statute. See Durr v. Cook, 589 F.2d 891 at 893-94. Moreover, this approach of looking behind an evidentiary privilege has been virtually mandated by the United States Supreme Court. See Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).
As construed in this case and other decisions by this court, the statute is constitutional.
Accordingly, this assignment lacks merit.
For the reasons assigned, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] This rule is to be distinguished from the related precept which provides that in a criminal case, any unauthorized communication by a non-juror with a juror during trial or deliberation about the matter pending before him is deemed presumptively prejudicial. State v. Wisham 371 So.2d 1151 (La.1979); State v. Marchand 362 So.2d 1090 (La.1978).