SAVOIE, Judge.
Defendant, Andrew Vessel, Jr., was indicted by the grand jury for the second degree murder of Percy Jerome Scott on or about February 21, 1981, in violation of La.R.S. 14:30.1. After trial by jury, defendant was found guilty as charged and sentenced to life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence, with credit for time served from arrest to the date of sentencing. Defendant appeals his conviction and sentence, alleging two assignments of error.
During the early morning hours of February 21,1981, Percy Jerome Scott was shot three times in the head and neck with a .22 caliber weapon. These wounds resulted in his death. The shooting occurred outside of the 3M Lounge, at a well-lighted corner.
Donald Ray Washington and Shelby Jackson were sitting in a car in the parking lot of the lounge when the murder occurred. Washington testified that he knew both the victim and the defendant. He stated that he saw the victim exit the lounge and proceed to the corner of the building, in the motion of zipping down his pants. Shortly thereafter, he observed the defendant exit the lounge and follow the same path as the victim, also in the motion of apparently zipping down his pants. Although he could see some object in defendant’s hand, he could not positively identify it as a gun. While both the victim and the defendant were still in his sight, Washington heard three shots. Defendant quickly exited the scene. Washington also observed two other persons in the parking lot, walking toward the lounge at the time of the shooting. Washington further testified that Shelby Jackson would not have seen the shooting since he was sitting with his eyes closed and his head either back or down. Washington did not immediately report the incident because he did not want to get involved. After seeing that the body had been discovered, and after Jackson exited his car, Washington left the scene. Several months later, he reported his observation to the police.
Jackson testified that he did not see the shooting, but that he did hear one to three shots. Immediately thereafter, Washington told him that defendant had shot the victim. He also did not wish to become involved and immediately left the scene.
A lounge employee testified that some unidentified person entered the lounge about the time of the incident and said that the victim and defendant were arguing. About thirty seconds thereafter, Aaron Spurlock entered the lounge and reported finding the victim’s body.
After the shooting, the police searched for the defendant at the home of a friend, Leroy Tennart, where the defendant had been living for several months. Tennart informed the police that he had not seen the defendant, but gave them permission to search the defendant’s room. Several .22 caliber bullets were found in that room.
The police also contacted the defendant’s place of employment. Although a paycheck was ready for him, he had not picked it up or telephoned his employer.
Several months after the murder, the defendant, accompanied by Tennart, turned himself into the police. The defendant allegedly stated he was tired of running. One policeman testified that defendant admitted that he was present when Scott was killed, and that he had had words with the victim. He also stated that Tennart had told him that the defendant usually carried *1126 a handgun. Tennart and the defendant both denied making these statements.
The defendant, testifying on his own behalf, denied his guilt and stated that he left the lounge that night at about 11:30 P.M. He further testified that he had brought his work clothes in a bag to the lounge, leaving them outside, because he was going to New Orleans to work. He stated that although he missed an earlier bus to New Orleans, he did take a bus to that city at about 1:80 A.M.
Dr. Hypolite Landry, the coroner, testified that the autopsy performed on Scott’s body revealed the cause of death to be gunshot wounds in the head. He also testified that no powder burns were found on the victim. A ballistics expert testified that weapons cease to leave powder burns when fired from between one and one-half to four feet away from the victim.
ASSIGNMENT OF ERROR NO. 1
Defendant contends that the trial court erred in refusing to permit him to impeach the testimony of a state witness, Shelby Jackson, by calling the defendant’s father and Tennart as witnesses to testify relative to a prior inconsistent statement made by Jackson. This assigned error is misleading since the defendant did, in fact, call his father and Tennart as witnesses. After reviewing the record, we find that the defendant’s real complaint is that the trial court refused to allow him to impeach the credibility of Jackson when called as defendant’s own witness.
The state called Shelby Jackson as its witness, who testified as set forth above. On cross-examination, defense counsel asked Jackson if he remembered giving him (defense counsel) an earlier statement to the effect that he saw no one, and no body, when he left the lounge and that no one had been shot. Jackson denied making any such statement.
During defendant’s case-in-chief, he called Jackson as his own witness. Jackson was again asked by defense counsel if he had not given a very different account to him in the presence of the defendant’s father and Tennart. Again, Jackson denied changing his account. At this point, defendant pled surprise and gave notice of his intention to impeach the credibility of the witness. The trial court refused to allow the impeachment.
Subsequently, defendant called his father and Tennart as witnesses. However, neither was asked any questions regarding Jackson’s alleged prior inconsistent statement to defense counsel in their presence.
When a defendant calls a witness as his own, who previously testified for the state, the defendant is subject to the same limitations of examination and impeachment as in the case of any other witness called by him. State v. Banks, 362 So.2d 540 (La.1978); State v. Monk, 315 So.2d 727 (La.1975). Hence, the defendant could not impeach the credibility of Jackson absent a showing of surprise or hostility. La.R.S. 15:487[1] and La.R.S. 15:488.[2] Since Jackson’s testimony is the same as both a defense and state witness, defendant has not made the requisite showing of surprise or hostility necessary for impeachment of Jackson as his own' witness. See State v. Banks, supra; State v. Monk, supra.
Moreover, the defendant laid the proper foundation during the cross-examination of Jackson to impeach his credibility by the introduction of the alleged prior inconsistent statement. See La.R.S. 15:493.[3] Yet, *1127 defendant made no attempt to impeach Jackson’s credibility in his direct examination of defendant’s father and Tennart.
We find this assignment of error to be without merit.
ASSIGNMENT OF ERROR NO. 2
Defendant also contends that the trial court erred in denying his motion for a new trial on the ground that the evidence against him was totally circumstantial and an insufficient basis for the verdict.
Accepting defendant’s interpretation of the evidence as totally circumstantial, we will review the evidence herein under the standards recently enunciated by the Louisiana Supreme Court in State v. Graham, 422 So.2d 123 (La.1982), in which the Court stated, at page 129:
“The Due Process Clause of the Fourteenth Amendment requires this court to review the evidence upon which a criminal conviction is based to determine whether it is minimally sufficient. A defendant has not been afforded due process, and his conviction cannot stand, unless, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Additionally, we are governed by our statutory rule as to circumstantial evidence: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. R.S. 15:438.”
Using the above standards, we find that the evidence viewed in the light most favorable to the state proves the guilt of the defendant to the exclusion of every reasonable hypothesis of innocence.
The record reflects that the defendant followed the victim out of the lounge and was standing next to him at the time he was killed. This is supported by the testimony of an impartial eyewitness who personally knew both the defendant and the victim. Additionally, this eyewitness testified that immediately after the shooting, the defendant hurriedly departed the scene. Admittedly, the eyewitness could not positively identify a gun in the defendant’s hand, but his immediate reaction to the shooting was to state to his companion that the defendant had shot the victim. The state also introduced evidence that immediately prior to the shooting, a lounge employee was told that the defendant and the victim were arguing.
Defendant’s answer to this testimony was that he had departed the lounge prior to the shooting. He stated that he left Baton Rouge for New Orleans that night and did not return for several months. Yet, his aunt who resides in Baton Rouge, saw him in her yard the next afternoon. She further told defendant that the police were looking for him, and that she wanted him to leave her premises.
Further, defendant denies he carried a handgun. However, several state witnesses testified that they had seen the defendant with a handgun. Additionally, 22 caliber cartridges of the type that killed the victim, were found in the defendant’s room.
Finally, a police officer testified that upon defendant’s arrest, the defendant told him that he was tired of running and wanted to turn himself over to the police. Defendant responded to this at trial by stating that he did not know he was wanted. However, defendant’s aunt’s uncontradicted testimony refutes defendant’s assertion that he did not know he was wanted by the police.
Thus, the evidence, viewed in the light most favorable to the prosecution, proves opportunity, motive, proximity, possession of a handgun of the same caliber used to kill the victim, possession of cartridges *1128 identical to those which killed the victim, flight and apparent subsequent remorse.
We find the evidence of defendant’s guilt sufficient to exclude every reasonable hypothesis of innocence. The trial court did not err in denying defendant’s motion for a new trial. This assignment of error is without merit.
For the foregoing reasons, the conviction and sentence are affirmed.
AFFIRMED.

. R.S. 15:487. Impeachment of own witness No one can impeach his own witness, unless he have been taken by surprise by the testimony of such witness, or unless the witness show hostility toward him, and, even then, the impeachment must be limited to evidence of prior contradictory statements.

. R.S. 15:488. Meaning of surprise “Surprise” in the sense of the last preceding article does not arise out of the mere failure of the witness to testify as expected, but out of his testifying upon some material matter against the party introducing him and in favor of the other side.

.R.S. 15:493. Foundation for proof of contradictory statement
Whenever the credibility of a witness is to be impeached by proof of any statement made by him contradictory to his testimony, he must first be asked whether he has made *1127 such statement, and his attention must be called to the time, place and circumstances, and to the person to whom the alleged statement was made, in order that the witness may have an opportunity of explaining that which is prima facie contradictory. If the witness does not distinctly admit making such statement, evidence that he did make it is admissible.