STOKER, Judge.
The defendant, John Thomas Campbell, was charged by a true bill with the crime of aggravated rape, a violation of LSA-R.S. 14:42. On August 13, 1984, jury selection began for this case. On August 15, 1984, the twelve-member jury returned a unanimous verdict of guilty as charged. On August 21, 1984, the defendant filed a motion for a new trial, which was denied by the district court. The defendant then waived the 24-hour delay and was sentenced to serve a term of life imprisonment in the Department of Corrections without benefit of parole, probation or suspension of sentence. The defendant appeals urging one assignment of error.
In essence the assignment is that the evidence was insufficient to prove the defendant’s guilt. Defendant urges that the only evidence against him was circumstantial, and the State failed to present evidence sufficient to meet the rigid tests required to convict on circumstantial evidence.
FACTS
In the early morning of December 16, 1984, the victim, a widowed school teacher, was awakened by a noise. When she opened her eyes, she saw the lower body of a naked black man standing by her bed. The victim never saw the assailant’s face because he was holding an object in front of his face at that time.
The assailant then turned off the victim’s television, which provided the only light in the bedroom, and jumped on the top of the victim. The assailant placed a pillow over the victim’s face and began to pull at her nightgown. At that time the victim began to plead with the assailant but was unsuccessful. The victim also attempted to struggle but was overcome by the attacker.
He then penetrated the victim’s rectum with his penis. This attack lasted several minutes. The victim screamed and struggled throughout this entire act.
After the assailant had finished, he exited the bedroom via an adjoining bathroom and closed the door behind him.
About that same time, the victim’s back door neighbor heard screams coming from the victim’s house and began to run toward the house in order to see if her neighbor needed help. The neighbor had run about halfway to the residence when she saw the naked black man running away from the victim’s residence. She was unable to distinguish the black man’s facial features. She immediately returned to her home and called the police.
After the police arrived, the victim was taken to Abbeville General Hospital where she was examined by Dr. Ardly Hebert. As a result of this examination, Dr. Hebert was able to determine that the victim’s rectum had been forcefully entered and that the penetration had occurred within a recent time period.
As a result of an investigation by the Abbeville Police Department, the defendant was indicted for aggravated rape.
ASSIGNMENT OF ERROR
The defendant contends that “the Court erred in denying the motion for a new trial because the State’s case being based completely on circumstantial evidence and the defense’s case based on direct evidence, in order to convict, not only did the State have to prove the guilt of the accused beyond a reasonable doubt but it must have excluded every reasonable hypothesis of innocence, which it completely failed to do.” The de *562 fendant argues that all of the aforementioned is shown by the record in the case. Thus, the accused should have been granted a new trial in this case.
The issue presented in this appeal is whether the State has adequately proven that John Thomas Campbell, the defendant, committed the aggravated rape of the victim.
When the issue of sufficiency of the evidence is raised on appeal the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Additionally, in cases involving circumstantial evidence, Louisiana courts are governed by LSA-R.S. 15:438, which states the following:
“The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.”
Incorporating this rule under the Jackson standard, this Court must determine whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact would have concluded beyond a reasonable doubt that every reasonable hypothesis of innocence had been excluded. State v. Austin, 399 So.2d 158 (La.1981); State v. Honeycutt, 438 So.2d 1303 (La.App. 3d Cir.1983), writ denied, 443 So.2d 585 (La.1983).
In State v. Captville, 448 So.2d 676 (La.1984), the Louisiana Supreme Court, in addressing the issue of whether sufficient evidence was presented at trial to convict a defendant of manslaughter, stated the following:
“When a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant’s own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. An evaluation of the reasonableness of other hypotheses of innocence provides a helpful methodology for determining the existence of a reasonable doubt. As we have recognized in such cases as State v. Wright, 445 So.2d 1198 (La.1984), State v. Graham, 422 So.2d 123 (La.1982), and State v. Sutton, 436 So.2d 471 (La.1983), the court does not determine whether another possible hypothesis has been suggested by defendant which could explain the events in an exculpatory fashion. Rather, the reviewing court evaluates the evidence in the light most favorable to the prosecution and determines whether the alternative hypothesis is sufficiently reasonable that a rational juror could not ‘have found proof of guilt beyond a reasonable doubt.’ Jackson v. Virginia, above.”
State v. Captville, 448 So.2d at 680.
LSA-R.S. 14:42 defines the crime of aggravated rape as follows:
“A. Aggravated rape is a rape committed where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
“(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
“(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
“(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.
“(4) When the victim is under the age of twelve years. Lack of knowledge of the victim’s age shall not be a defense.
“(5) When two or more offenders participated in the act.
“B. For purposes of Paragraph (5), ‘participate’ shall mean:
“(1) Commit the act of rape.
“(2) Physically assist in the commission of such act.
*563 “C. Whoever commits the crime of aggravated rape shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.”
La.R.S. 14:41 defines rape as follows:
“Rape is the act of anal or vaginal sexual intercourse with a male or female person who is not the spouse of the offender, committed without the person’s lawful consent.
“Emission is not necessary; and any sexual penetration, vaginal or anal, however slight is sufficient to complete the crime.
“For the purposes of this Chapter, a person shall not be considered to be a spouse if a judgment of separation from bed and board has been rendered.”
A review of the record reveals that sufficient evidence was presented at trial to find the defendant guilty of aggravated rape.
At trial, the victim testified that in the early morning hours of December 16, 1983, she was awakened by a noise. The victim testified that when she opened her eyes she saw the naked, lower body of a black man standing by her bed. She testified that the assailant turned off the television, which provided the only light in the bedroom, and jumped on top of her. The victim testified that she never saw the assailant’s face because he was holding an object in front of it at the time.
The victim testified that the assailant placed a pillow over her face and began to pull at her nightgown. She testified that she pleaded and struggled but was overcome by his greater force. She testified that the more she struggled and screamed, the harder the assailant pushed on the pillow and that the victim was afraid of being smothered. The victim testified that after the attacker had raised her nightgown, he rubbed his penis up and down her vagina. She testified that he then penetrated her rectum with his penis. The victim testified that she screamed and struggled throughout this incident.
The victim testified that during the course of this attack, she touched the assailant’s head and realized that he had a black person’s hair. She testified that she was positive that the assailant’s hair was that of a negro because she had been teaching for many years and had touched her students’ hair often. The victim also testified that the attacker’s body was “lean, wasn’t very tall, but he was strong and agile.”
The victim testified that after the assailant had finished, he exited the bedroom via the adjoining bathroom and closed the door behind him. The victim testified that she grabbed a can of mace, which she kept near her bed, and opened the bathroom door. She testified that after she had sprayed the contents of the can into the bathroom, she realized that the defendant was no longer there and that the bathroom window was opened. The victim testified that she assumed that all the windows were locked when she went to bed on the night of the attack, because it was cold outside and her central heating unit was not working. She testified that she knew the doors were locked on the night of the attack but she did not remember checking the windows.
The back door neighbor of the victim mentioned above testified that on the date on which the offense occurred, she awoke at 4:00 a.m. to prepare for the 4:45 a.m. arrival of her beauty parlor customer. She testified that at approximately 4:30 a.m. she heard her husband’s dogs begin to bark and opened her back door to investigate the reason for the disturbance. The neighbor testified that when she opened her back door, she heard a screaming noise coming from the victim’s residence. She further testified that she immediately began to run toward the victim’s residence. She testified that when she was about halfway there, she observed a naked, black man running away from the victim’s house. She testified that there was sufficient lighting in the victim’s backyard to discern that the man was black but that she was unable to distinguish any of his facial features. She testified that the man appeared to be *564 approximately 5’4”-5’5” tall. Chief Hardy testified that the defendant was measured as being 5’4” tall when he was arrested. The neighbor also testified that when she returned to the victim’s residence, after calling the police, the victim stated that she had just been raped.
Patrolman Mike Hardy testified that on December 16, 1983, at approximately 4:33 a.m. he was dispatched to the victim’s residence. Patrolman Hardy testified that when he inspected the residence, all of the doors were locked, except for the door that he had entered, and that the window in the bathroom adjacent to the master bedroom was closed but unlocked. He testified that he also saw a small stepladder outside that bathroom window.
He testified that another officer saw a car leaving the scene and followed that car. That car was driven by Joseph Taylor, who became the initial suspect in this case.
Patrolman Hardy testified that he returned to the victim’s residence at about 8:30 a.m. on that date and noticed foot tracks leading away from the area near the bathroom window. He testified that the path was formed by tracks in the dew, grass and leaves. He also testified that he was able to trace the tracks for about 100 feet and that the path was leading in the direction of the defendant’s residence. The foot tracks ended over 250 feet away from the defendant’s residence.
Chief Minos Hardy testified that fingerprints were lifted at the victim’s residence during the course of the investigation. Detective Bennie LeMaire testified that he lifted a fingerprint from the window sill inside the victim’s bathroom. Sybil Guidry and Carol Richards, fingerprint experts, testified that the print lifted from the window sill was a positive match with the defendant’s right index finger. Each worked independently and each said there was no doubt in her mind that the same person made the print on the window sill and the known print they worked from. The victim testified that to her knowledge, the defendant had never been inside her house.
Dr. Ardly Hebert testified that on the date of the offense, he conducted a physical examination of the victim. He testified that he conducted the usual examination and noticed that the victim’s rectum showed signs of recent irritation, a condition consistent with forceful penetration. He testified that numerous spermatozoa were taken from the victim’s rectum and that their active nature was suggestive of recent penetration. He also testified that he sent hair, blood and other fluid samples to the crime lab for analysis.
Kenneth Cockerham, a forensic scientist, testified that he received hair, blood and saliva samples from Joseph Taylor, the initial suspect, and the defendant. He also testified that he received the victim’s rape kit, clothing and bedding taken from the victim’s residence.
Mr. Cockerham testified that he conducted an analysis of the ABO systems or antigen systems of the victim, defendant, and Joseph Taylor and determined that the victim and the defendant were Type 0, whereas Joseph Taylor was Type A. He testified that after conducting tests to determine the three individuals’ secretor status category, which tests the ability of an individual to secrete their ABO blood group substance into other bodily fluids, he found that all three individuals were secretors. He testified that he conducted tests in the Phosphoglu-comutase system or PGM system and determined that all three individuals had the same type, i.e., one (1) plus and one (1) minus. He testified that as a result of tests conducted in the Esterase-D system, the defendant’s blood was distinguishable from the others by being Type 2-1. He also testified that he conducted Pepti-dase-A tests and determined that the victim, the defendant and Joseph Taylor were all Type 1. He testified that tests were conducted on the rectal swab taken from the victim, and he determined that the ABO system was Type O, the PGM system was one (1) plus one (1) minus, and the Pepti-dase-A system was type 1.
Mr. Cockerham testified that on the basis of the difference in the ABO typings, Jo *565 seph Taylor, the initial suspect, was eliminated as a possible donor of the semen taken from the victim’s rectum. He testified that the defendant could not be eliminated as a possible semen donor on the basis of these test results. The blood typ-ings results from the rectal swab and the defendant matched. He testified that only between 2.8% and 5.3% of the black population would have the same blood types, i.e., ABO system Type 0, PGM system type one (1) plus one (1) minus, Peptidase-A, System Type 1, and being a secretor, as the defendant.
Kenneth Cockerham testified that the pubic hairs found on the victim’s bedding and towel matched the pubic hair sample taken from the defendant. He testified that it was impossible to say that this hair came from a particular individual and noted that there were variations in the types of pubic hair.
Raphael Campbell, the defendant’s nephew, testified that the defendant had lived with him since October, 1983, and that on the date of the offense, he had last seen the defendant at 6:30 a.m., and that the defendant was sleeping at that time. He testified that he did not know the whereabouts of the defendant from 4:15 a.m. to 6:30 a.m. because he was sleeping. He testified that he lived only one or two minutes from the victim’s residence. On rebuttal, Patrolman Hardy testified that during the course of the investigation, he had run from the defendant’s residence to the victim’s home on two occasions and that it only took a maximum time of 28 seconds to travel that distance.
In this case, a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, would have concluded beyond a reasonable doubt that every reasonable hypothesis of innocence had been excluded and that the defendant was guilty of aggravated rape. The evidence present at trial proved that the victim had been raped and that she had resisted to the utmost but was overcome by his greater force. In State v. Spikes, 428 So.2d 1217 (La.App. 3d Cir.1983), this Court determined that evidence that a 68-year-old victim had screamed, hollered and fought with the rapist and that he had attempted to smother her was sufficient to show that the victim resisted to the utmost. Here, the victim kept screaming and fighting throughout the attack, and the rapist tried to smother her.
The evidence showed that the defendant’s fingerprint was found on the inside of the victim’s bathroom window sill, which appears to be the probable escape route of the victim. In State v. Stokes, 441 So.2d 1308 (La.App. 1st Cir.1983), the First Circuit determined that when the evidence of the defendant’s palm print being found on the surface inside the victim’s screen door was considered with the other evidence, sufficient evidence existed to find the defendant guilty of aggravated rape. The evidence also showed that a ladder was found outside that bathroom window and that foot tracks were found leading from that area in the direction of the defendant’s house.
The evidence showed that the victim’s neighbor saw a naked black male running from the area of the victim’s house and that she stated he was approximately 5' 4" to 5' 5" tall. Chief Hardy then testified that the defendant was only 5' 4" tall.
Kenneth Cockerham testified that he conducted chemical tests on the defendant’s blood and saliva and determined that the defendant was not excluded from being a possible donor of the semen taken from the victim’s rectum. He testified that the defendant’s pubic hair matched those found in the bedding. He further testified that only 2.8% to 5.3% of the black population had the same blood types that were found in the rectal swab and the defendant’s blood. Mr. Cockerham testified that his test results showed that the initial suspect, Joseph Taylor, could not have been the semen donor.
The defendant’s two witnesses both testified that on the night of the rape, the defendant had traveled to Breaux Bridge with them but that he was last seen at about 4:15 a.m. Patrolman Hardy testified *566 that he ran the distance between the defendant’s residence and the victim’s house in less than 30 seconds. Finally, the victim herself testified that the entire attack lasted only a few minutes.
While it is true that no one ever saw the rapist’s face, the evidence presented at trial appears to prove overwhelmingly that the defendant was the rapist. The two reasonable hypotheses of innocence apparent in this case, i.e., that Joseph Taylor was the rapist or that the defendant was at another location at the time of the rape, were excluded by the evidence presented by the State.
Based on the foregoing, it appears that the defendant was guilty of the aggravated rape of the victim. This assignment of error lacks merit.
The judgment of the trial court is affirmed.
AFFIRMED.