# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 08-962

**STATE OF LOUISIANA**

**VERSUS**

**STEVEN MARK "MARC" ANDERSON**

****************

## APPEAL FROM THE
## FIFTEENTH JUDICIAL DISTRICT COURT
## PARISH OF LAFAYETTE, NO. 110556-A
## HONORABLE JOHN D. TRAHAN, DISTRICT JUDGE

****************

## JAMES T. GENOVESE
## JUDGE

****************

Court composed of Oswald A. Decuir, J. David Painter, and James T. Genovese, Judges.

**AFFIRMED AS AMENDED, AND REMANDED.**

**G. Paul Marx**
**Post Office Box 82389**
**Lafayette, Louisiana 70598**
**(337) 237-2537**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Steven Mark "Marc" Anderson**


**Edward Marquet**
**Post Office Box 53733**
**Lafayette, Louisiana 70505**
**(337) 237-6841**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Steven Mark "Marc" Anderson**

**Michael Harson**
**District Attorney – Fifteenth Judicial District**
**Michele S. Billeaud**
**Assistant District Attorney**
**Post Office Box 3304**
**Lafayette, Louisiana 70502**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**GENOVESE, Judge.**

On June 6, 2006, the Defendant, Steven Mark "Marc" Anderson, was charged by bill of information as follows: 1) count one – theft of a firearm, a felony in violation La.R.S. 14:67.15; 2) count two – possession of a firearm by a convicted felon, a felony in violation of La.R.S. 14:95.1; and 3) count three – possession of drug paraphernalia, a misdemeanor in violation of La.R.S. 40:1023. A trial by jury on the felony charges was held on November 26 and 27, 2007, and the jury found the Defendant guilty as charged on the felonies in counts one and two. The trial court found the Defendant guilty on the misdemeanor charge in count three.

On March 5, 2008, the Defendant was sentenced to serve thirteen years at hard labor for possession of a firearm by a convicted felon to be served without benefit of probation, parole, or suspension of sentence. He was also fined $1,000.00. For theft of a firearm, the Defendant was sentenced to five years at hard labor without benefit of probation, parole, or suspension of sentence. Lastly, for possession of drug paraphernalia, the Defendant was ordered to serve six months in the parish jail. The Defendant's sentences were ordered to run concurrently with each other.

Following sentencing, the State gave oral notice of its intent to file a multiple offender bill, charging the Defendant as a multiple offender; however, said bill is not found in the record, nor is a hearing or ruling included in the record. The Defendant did not file a motion to reconsider sentence.

The Defendant appeals, asserting that the evidence is insufficient to support his convictions and that the trial court should have ordered a mistrial because the alternate juror participated in deliberations. For the following reasons, we affirm as amended and remand.

1

## FACTS

On April 4, 2006, the Defendant's stepfather, Joseph Boudreaux, reported that the Defendant had stolen his handgun. When the Defendant was found, he admitted to taking the gun from his stepfather's house and stated that he traded it for crack cocaine. The Defendant was subsequently arrested. After being advised of his rights, he waived his rights and signed an Interrogation: Advice of Rights Form. Once more, the Defendant admitted to taking his stepfather's gun and stated that he gave it to someone else.

More than two months after the initial report, Mr. Boudreaux reported that the gun had not been stolen after all and that his wife, Margaret Boudreaux, who is also the Defendant's mother, had moved the gun to Mr. Boudreaux's mother's house because the Defendant, a convicted felon, was not allowed to be around the gun. Mrs. Boudreaux, however, did not contact the district attorney's office to report that she had moved the gun, nor did she produce the gun to confirm that the gun was not stolen. Further, Mr. Boudreaux allegedly sold the gun at a gun show, despite the fact that charges were pending against the Defendant for theft of the gun.

## ERRORS PATENT AND PROCEDURAL ISSUE

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we note that there are several errors patent, a procedural issue, and the minutes of sentencing are in need of correction.

In this case, there was a misjoinder of offenses in the bill of information. The bill of information charged the Defendant with three separate counts: 1) count one – theft of a firearm, a violation La.R.S. 14:67.15; 2) count two – possession of a firearm

by a convicted felon, a violation of La.R.S. 14:95.1; and 3) count three – possession of drug paraphernalia, a violation of La.R.S. 40:1023.

Louisiana Code of Criminal Procedure Article 493 provides for the joinder of offenses in a single bill of information under limited circumstances if the offenses joined are triable by the same mode of trial. Louisiana Code of Criminal Procedure Article 493.2 allows joinder of offenses in which punishment is necessarily confinement at hard labor to be charged in the same indictment or bill of information with offenses in which the punishment may be confinement at hard labor under limited circumstances.

In the present case, count two, which is punishable at hard labor, is triable by a twelve person jury, ten of whom must concur. *See* La.Code Crim.P. art. 782. Count one, in which the punishment is confinement with or without hard labor, is triable by a jury composed of six jurors, all of whom must concur. *See* La.Code Crim.P. art. 782 and La.Const. art. 1, § 17. Count three, which is a misdemeanor, is triable by a judge only. *See* La.Code Crim.P. art. 779. Therefore, pursuant to La.Code Crim.P. art. 493.2, counts one and two were properly joined, but count three, the misdemeanor, was improperly joined.

However, the Defendant did not file a motion to quash the indictment on the basis of misjoinder of offenses as required by statute. *See* La.Code Crim.P. art. 495. Accordingly, this error is deemed waived.

Next, because the misdemeanor charge was not triable by a jury, the proper mode of appellate review for that offense is an application for writ of review, rather than an appeal. *See* La.Code Crim.P. art. 912.1. In *State v. Turner*, 04-1250 (La.App. 3 Cir. 3/2/05), 896 So.2d 286, *writ denied*, 05-871 (La. 12/12/05), 917 So.2d 1084,

3

this court severed a misdemeanor conviction from the defendant's appeal of two felony convictions. This court ordered the defendant to file a writ of review regarding the misdemeanor conviction in compliance with the rules of court. Noting that the defendant did not make any specific arguments regarding the misdemeanor conviction, this court considered the notice of appeal as a notice to file a writ of review within thirty days of its opinion, if the defendant desired to seek review of the misdemeanor conviction.

As in *Turner*, the Defendant herein has not raised any assignment of error regarding his misdemeanor conviction. Therefore, as was done in *Turner,* we sever Defendant's misdemeanor conviction from his appeal and order the Defendant to file a writ of review, should he desire to do so, regarding the misdemeanor conviction in compliance with the Uniform Rules of Louisiana Courts of Appeal.

Next, the trial court imposed an illegally lenient sentence on the conviction of theft of a firearm. In addition to imprisonment, the penalty for a conviction of theft of a firearm also mandates a fine of $1,000.00. *See* La.R.S. 14:67.15. The trial court failed to impose a fine, thus rendering the Defendant's sentence on this charge illegally lenient. We, therefore, amend Defendant's illegally lenient sentence by imposing upon the Defendant the $1,000.00 fine mandated by La.R.S. 14:67.15. We also instruct the trial court to make a notation in the minutes reflecting the amendment.

We likewise note the minutes of sentencing are in need of correction. The minutes state that the trial court ordered the Defendant to pay a $100.00 fine for the conviction of possession of a firearm by a convicted felon. The transcript, however, indicates that the trial court ordered the Defendant to pay a $1,000.00 fine for that

4

offense. Therefore, we remand the case to the trial court and instruct it to amend the minutes of sentencing to correctly reflect the $1,000.00 fine imposed on the conviction of possession of a firearm by a convicted felon.

## ASSIGNMENTS OF ERROR

The Defendant is before this court asserting the following three assignments of error:

1.  The participation of an alternate juror in deliberations is a patent structural error. The conviction must be reversed because the alternate participated in discussion and asked a specific question during deliberations. The discovery during jury deliberations was too late for the Trial Court to seek specific evidence on the question of violation of the law, and reversal is the only remedy.

2.  The jury could not convict the Defendant of being in Possession of a Firearm where no-one could testify for a fact that he ever had possession. The conjecture regarding a weapon taken from the Defendant's father and what happened to it was insufficient to prove any crime had occurred, and testimony of the owner of the gun and his wife that it had been sold at a gun show was sufficient to create a reasonable doubt on the charges of theft and felon in possession of a firearm.

3.  Without evidence of there being a firearm, the "corpus delecti[,]" the statements of the Defendant could not be sufficient to establish proof beyond a reasonable doubt of the crime of being a Felon in Possession of a Firearm.

### *ASSIGNMENTS OF ERROR 2 AND 3:*

Assignments of error two and three involve claims of insufficient evidence and are interrelated. As such, these assignments are addressed first and considered together. The Defendant argues that the evidence was insufficient to convict him of theft, and, without proof of theft, the evidence was insufficient to convict him of possession of a firearm by a convicted felon.

The analysis for a claim of insufficient evidence is well-settled:

When the issue of sufficiency of evidence is raised on appeal, the

5

critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. See *State ex rel. Graffagnino*, 436 So.2d 559 (citing *State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Theft of a firearm is defined in La.R.S. 14:67.15(A) as "the misappropriation or taking of a firearm which belongs to another, either without the consent of the other to the misappropriation or taking or by means of fraudulent conduct, practices, or representations." Also, the defendant must intend to permanently deprive the owner of the firearm.

At trial, Lieutenant McCullan Gallien, with the Lafayette Police Department, testified that, on April 4, 2006, he received a complaint that a handgun owned by Joseph Boudreaux was stolen and that Mr. Boudreaux believed that the Defendant had taken the gun. Mr. Boudreaux, the Defendant's stepfather, gave a description of the Defendant and a location to begin searching for him. When the Defendant was found, he was advised of his rights and indicated to Lieutenant Gallien that he understood his rights.

Next, Lieutenant Gallien asked the Defendant about the location of the gun, and the Defendant offered to help him find it and get it off the street. According to Lieutenant Gallien, the Defendant admitted taking the gun from inside his stepfather's

house. The Defendant did not indicate to Lieutenant Gallien that Mr. Boudreaux had given him permission to take the gun. Further, the Defendant reported that he put the gun in his waistband and transported it to an area where he then traded the gun for crack cocaine.

The Defendant was subsequently arrested by Lafayette City Police and taken to its Department of Vital Services where he was advised of his rights once more and signed an Interrogation: Advice of Rights form. When asked if he had used any illegal narcotics, the Defendant reported that he had used crack cocaine an hour prior to the interview. The Defendant denied taking any medication. Lieutenant Gallien testified that the Defendant did not appear sick, dazed, or confused, and appeared to be coherent and aware of his surroundings and the questions Lieutenant Gallien was asking. The Defendant did not appear to have any problem comprehending. Based on his observations of the Defendant, Lieutenant Gallien believed that the Defendant was able to answer his questions.

After waiving his rights, Lieutenant Gallien asked the Defendant if he could help him find the gun. The Defendant indicated again that he had the gun in his waistband when he gave it to someone else. Also, during their conversation, the Defendant admitted that he had taken the gun and that the gun belonged to his stepfather. Lieutenant Gallien stated that he had spoken with Mr. Boudreaux prior to taking the Defendant's statement and that the Defendant's statement was consistent with what Mr. Boudreaux had reported. According to Lieutenant Gallien, the Defendant did not complain of feeling ill during the interview, but later on reported that he had swallowed some crack cocaine. During the interview, the Defendant indicated that he wanted to stop the interview. Accordingly, Lieutenant Gallien

7

complied, stopped the video tape recorder, and gave it to the booking officer.

Lieutenant Gallien stated that he began looking for the gun, a Ruger .357 revolver, which had been described by Mr. Boudreaux at the time he made the complaint. Also, the serial number was entered into the NCIC database used by officers around the country to check to see if an item has been stolen. Hence, if someone ran the serial number on Mr. Boudreaux's gun, the NCIC would report it as stolen. According to Lieutenant Gallien, the report of the stolen gun had never been removed from the database, and he had checked the database the morning before testifying.

Lieutenant Gallien also testified that Mr. Boudreaux completed a written statement about what had occurred, which was submitted into evidence. According to Lieutenant Gallien, Mr. Boudreaux's written statement was consistent with his prior verbal statement, and he never indicated that he did not want to proceed with the prosecution. Mr. Boudreaux was also advised to notify the department if he located the gun so that it could be removed from the NCIC database. Lieutenant Gallien stated that Mr. Boudreaux never notified him that he had located the gun.

Following the interview, the Defendant was taken to the hospital after reporting that he had swallowed three grams of crack cocaine. Lieutenant Gallien did not recall seeing any symptoms, such as sweating, or anything life threatening. He did not accompany the Defendant to the hospital, and he was not sure how long the Defendant was at the hospital.

Mr. Boudreaux testified at trial that he had been married to the Defendant's mother for seven years and that the Defendant was his wife's only child. Mr. Boudreaux maintained that he got along with the Defendant. With regard to the gun,

8

Mr. Boudreaux stated that he reported to the police that the gun was taken from his home by the Defendant. In Mr. Boudreaux's report to the police, he wrote:

> On April 4 I had all kind of dope deliveries coming at my house. So I went in my Bed Room look under the mattress and my gun was gone. So I called my wife and she said she hadn't seen it. So I asked Steven Anderson about it, he said he picked the lock on the bedroom door and stole it. He would need 60 dollars to pay the drug dealer so I gave him the sixty dollars he never came back.

At trial, Mr. Boudreaux testified that he did not know at the time that his wife had moved the gun to his mother's house and maintained that his wife had not told him anything about moving the gun.

After discovering that the gun was missing, Mr. Boudreaux asked the Defendant if he had taken the gun. According to Mr. Boudreaux, the Defendant did not admit to taking the gun, but instructed Mr. Boudreaux to give him seventy dollars, and he would bring the gun back to him. Mr. Boudreaux complied because he thought the Defendant had taken the gun. The Defendant left, telling Mr. Boudreaux that he was going to look for the gun, but never came back. At that time, Mr. Boudreaux went to the police and filled out a report. Next, Mr. Boudreaux stated: "A couple days later, I guess, you know, after I pressed charges on him, told my wife about it. She told me, 'Well, I put the gun at your momma's house.' I didn't know. So I came back here and I filled out a report." Mr. Boudreaux indicated that he filled out a report to drop the charges.

When asked what happened to the gun, Mr. Boudreaux testified that he sold it at a gun show because he had no use for it and needed money at the time. He also stated that his wife moved the gun because she knew that the Defendant could not be around guns. According to Mr. Boudreaux, the Defendant did not know at the time that there was a gun under the mattress.

9

On cross-examination, Mr. Boudreaux admitted reporting that, when he confronted the Defendant, the Defendant told him that he had picked the lock on his bedroom door, taken the gun, and traded it for crack cocaine. Mr. Boudreaux maintained at trial, however, that the Defendant told him this to get the seventy dollars to go buy crack.

Mr. Boudreaux also testified that he kept his bedroom door locked because he knew the Defendant was on crack cocaine and that "crack heads" were coming around his house. He also stated that he should have put a better lock on the bedroom door and admitted that the lock had actually been picked by the Defendant so he could purportedly get the gun and his wife's change.

When asked why his wife did not tell him that she had moved the gun when he first told her he could not find it, Mr. Boudreaux had no explanation. He just reiterated his prior testimony that, when his wife learned a few days later that he had pressed charges against the Defendant, she told him that she had moved the gun.

Mr. Boudreaux was shown a copy of the report indicating that the charges should be dropped because he had found the gun. He acknowledged his handwriting on the report and that the report was dated June 12, 2006, more than two months after the initial report. Mr. Boudreaux could not recall when he sold the gun.

Mr. Boudreaux admitted that he refused to speak with the assistant district attorney who called and made several attempts to come to his house to speak with him about the claim that he had found his gun. He also admitted that he would not answer the door when she came to his house. Mr. Boudreaux acknowledged that the assistant district attorney left a message on his phone, indicating that she needed to speak to him and to please answer the door. He was also asked if he thought it would

10

be important to speak with the assistant district attorney prosecuting the case if he had actually found the gun. Mr. Boudreaux responded, "I don't know."

Mr. Boudreaux admitted that he was aware that charges were still pending against the Defendant regarding the gun, but maintained that there was nothing else he could do other than filing the affidavit. He stated once more that he sold the gun at a gun show a couple of years ago and did not remember what he did with the receipt. Mr. Boudreaux also admitted that the incident had put a strain on his relationship with his wife since the Defendant was her only child.

The Defendant's mother, Margaret Boudreaux, testified that, when she returned from work on the day Mr. Boudreaux reported the gun stolen, he told her what had happened, and she informed him that she had packed up the gun and taken it to his mother's house. She explained that the Defendant was not supposed to be around weapons because he was a convicted felon. According to Mrs. Boudreaux, she had told Mr. Boudreaux about moving the gun, and she guessed that he must have forgotten about it since it had been a long time. Mrs. Boudreaux stated that, since the late nineties, Mr. Boudreaux has had two strokes, two heart attacks, and had been taking a lot of medication since that time. As such, Mrs. Boudreaux maintained that he forgets a lot.

With regard to the initial report, Mrs. Boudreaux testified that Mr. Boudreaux did not call her about the missing gun as indicated in the report, and she maintained that she did not speak to him until that evening when she returned from work. At that time, she told Mr. Boudreaux that the Defendant could not have stolen the gun.

Mrs. Boudreaux also stated that Mr. Boudreaux attends a lot of gun shows, and she believed that he sold the gun because he said so; however, she was not with him

11

when he sold it. Mrs. Boudreaux testified that she did not force Mr. Boudreaux to sign the document seeking to drop the charges and that he did so voluntarily. According to Mrs. Boudreaux, she retrieved Mr. Boudreaux's gun and gave it back to him, telling him that the Defendant did not take it.

On cross-examination, Mrs. Boudreaux confirmed that she had seen the assistant district attorney several times in court and at court hearings and that they had talked about the case and the Defendant's future; however, Mrs. Boudreaux had no explanation as to why she never told the assistant district attorney that she found the gun or that she moved the gun to her mother-in-law's house. Instead, Mrs. Boudreaux responded, "Well, you asked to come see it, so you had to know that I had it." When asked why she did not talk to the assistant district attorney about the fact that the gun was found at her mother-in-law's house, Mrs. Boudreaux stated that she was talking to Mr. Amos, counsel for the Defendant, who told her not to talk about the gun or show the assistant district attorney the gun. According to Mrs. Boudreaux, Mr. Amos told her that the assistant district attorney wanted to take a picture of the gun to use it against the Defendant in court. However, Mrs. Boudreaux could not explain how a gun that was not stolen could be used against the Defendant in court to prove that he stole it.

Mrs. Boudreaux maintained that she was not lying and that her son was being charged for a crime for which he was not guilty. However, she could not explain why she had not tried to help the Defendant until the day of trial, a year and a half later. When she arrived home from work and learned that her husband had reported the gun stolen, she did not immediately go to the police at that time and report the mistake, or report that her husband had made the mistake because he was sick and forgetful.

Mrs. Boudreaux stated that Mr. Boudreaux was going to take care of the problem and that she had to work because "[p]eople need their money."

On appeal, the Defendant asserts that no one testified for a fact that the Defendant ever possessed the gun and complains that the State introduced out of court statements to contradict the testimony of Mr. and Mrs. Boudreaux that the gun was never stolen. Also, the Defendant complains that the credibility of Mr. and Mrs. Boudreaux was not challenged. Lastly, the Defendant maintains that the testimony of Mr. Boudreaux and his mother that the gun was sold at a gun show was sufficient to create a reasonable doubt as to the theft and possession charges.

First, it was the State's burden to prove that the theft occurred, not to contradict the defense that the gun was not stolen as stated by the Defendant. Second, it was the Defendant's burden to contradict the evidence presented by the State to establish a reasonable doubt as to the charges. Further, the Defendant's assertion that the State did not put on any testimony to prove its case is incorrect.

The record reflects that, in addition to the Defendant's video recorded statement and Mr. Boudreaux's initial report which both indicate that the Defendant had stolen Mr. Boudreaux's gun, Lieutenant Gallien also testified that the Defendant confessed to stealing the gun and trading it for crack cocaine. After receiving Mr. Boudreaux's complaint that the gun had been stolen by the Defendant, Mr. Boudreaux gave Lieutenant Gallien a description of the Defendant and a location to begin searching for him. When the Defendant was found, he admitted taking the gun from his stepfather's house and transporting it in his waistband to an area where he traded it for crack cocaine. The Defendant even offered to help Lieutenant Gallien find the gun. Then, in a recorded statement, the Defendant admitted a second time

that he had taken the gun and that the gun belonged to his stepfather. Also, the Defendant indicated once more that he had the gun in his waistband when he gave it to someone else.

In response to these allegations, the defense called on Mr. and Mrs. Boudreaux to testify that the gun had not been stolen and asserts on appeal that their credibility was not challenged at trial. We disagree. The record is replete with inconsistencies in the testimonies of these witnesses. First, Mr. Boudreaux waited more than two months to recant his allegation of theft, even though he testified that Mrs. Boudreaux informed him a couple of days later that she had moved the gun. Also, Mrs. Boudreaux maintained that Mr. Boudreaux did not call her before making the report, and she indicated that she told Mr. Boudreaux the same evening he reported the theft that she had moved the gun, not a couple of days later as stated by Mr. Boudreaux.

Even more incredible is the fact that, other than filing an affidavit more than two months after the charge, Mr. and Mrs. Boudreaux did nothing to clear the Defendant of the charges, even up to the day of trial. They would not accept calls from the assistant district attorney to prove that the gun was found, nor would they allow her to see the gun. Moreover, Mr. Boudreaux allegedly sold the gun, the same gun which would have exonerated the Defendant, at a gun show.

Simply put, not only did the testimony of these two witnesses conflict with each other, their credibility from the record alone does not support their claim that the gun was later found and was not stolen as originally reported. Considering the evidence and testimony at trial and the lack of credible evidence to cast a reasonable doubt, we find that the State satisfied its burden of proving the elements of theft of a firearm beyond a reasonable doubt.

14

Possession of a firearm by a convicted felon is defined in La.R.S. 14:95.1(A) (footnote omitted), which reads as follows:

It is unlawful for any person who has been convicted of a crime of violence as defined in R.S. 14:2(B) which is a felony or simple burglary, burglary of a pharmacy, burglary of an inhabited dwelling, unauthorized entry of an inhabited dwelling, felony illegal use of weapons or dangerous instrumentalities, manufacture or possession of a delayed action incendiary device, manufacture or possession of a bomb, or any violation of the Uniform Controlled Dangerous Substances Law which is a felony, or any crime which is defined as a sex offense in R.S. 15:541(14.1), or any crime defined as an attempt to commit one of the above-enumerated offenses under the laws of this state, or who has been convicted under the laws of any other state or of the United States or of any foreign government or country of a crime which, if committed in this state, would be one of the above-enumerated crimes, to possess a firearm or carry a concealed weapon.

The only element that the Defendant challenges is possession of the firearm. The Defendant contends that the State did not prove that the theft of the firearm had occurred because he never had possession of the gun; and, therefore, the State did not prove that he possessed the firearm for the purpose of proving this offense.

As set forth above, we find that the State, in its efforts to prove that the Defendant committed theft of a firearm, did prove that the Defendant possessed Mr. Boudreaux's gun. As such, there is no merit to this claim or the claims that he did not take Mr. Boudreaux's gun. Accordingly, the Defendant's convictions are affirmed.

***ASSIGNMENT OF ERROR NO. 1:***

In this assignment, the Defendant argues that the participation of an alternate juror in the jury deliberations is a patent structural error. The Defendant maintains that, because the alternate juror asked a specific question during jury deliberations, his convictions must be reversed. Further, the Defendant contends that the discovery of the alternate juror being involved during deliberations came too late for the trial court to seek specific evidence as to the violation.

15

In support of his argument, the Defendant refers to *State v. Barber*, 97-2749 (La. 4/24/98), 708 So.2d 1054. From the limited facts of this writ opinion, it appears that alternate jurors were present during deliberations. As a result thereby, the case was remanded to the trial court for an evidentiary hearing to determine if the outcome was affected by the presence of alternate jurors and to what extent the outcome was affected. In rendering its ruling, the supreme court in *Barber* relied on La.Code Evid. art. 606(B), and concluded as follows:

> Participation by alternates in deliberations is an extraneous influence on the jury representing a *prima facie* case of prejudice requiring reversal. La.C.E. art. 606(B); *State v. Howard*, 573 So.2d 481 (La.1991); *State v. Smith*, 367 So.2d 857 (La.1979). Louisiana courts are "required to take evidence upon well-pleaded allegations of prejudicial juror misconduct. . . ." *State v. Graham*, 422 So.2d 123, 131-132 (La.1982); *State v. Horne*, 679 So.2d 953, 958 (La.App. 2nd Cir. 8/21/96), *writ denied*, 688 So.2d 521 (La. 2/21/97); *State v. Sanders*, 539 So.2d 114, 121 (La.App. 2nd Cir.), *writ denied*, 546 So.2d 1212 (La.1989); *State v. Duncan*, 563 So.2d 1269, 1272 (La.App. 1st Cir.1990). *See also State v. Searile*, 643 So.2d 455, 457-458 (La.App. 3rd Cir. 10/5/94). At the conclusion of the hearing, the trial court shall determine whether a new trial or other appropriate relief is required, reserving to the parties a right to seek review of the ruling.

*Id*. at 1054.

The States contends, on the other hand, that the presumption of prejudice as a result of an unauthorized communication by a non-juror during trial is not conclusive. The State, however, has the burden to establish, after notice to the Defendant and a hearing, that the contact between the non-juror and juror was harmless to the Defendant. In support of its argument, the State refers to *State v. Bibb*, 626 So.2d 913, 922 (La.App. 5 Cir. 1993), *writ denied,* 93-3127 (La. 9/16/94), 642 So.2d 188, wherein the court addressed the issue as follows:

> Initially in any trial, there is a presumption of jury impartiality. *United States v. Winkle*, 587 F.2d 705, 714 (5th Cir.), *cert denied*, 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979). However, any

16

unauthorized communication, contact, or tampering directly or indirectly, made by a non-juror with a juror during a trial about the matter pending before the jury is deemed presumptively prejudicial, if not made in accordance with rules of court and the instructions and directions of the court made during the trial, with full knowledge of all the parties. The presumption is not conclusive, but the burden rests heavily upon the state to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to defendant. *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954); *State v. Marchand*, 362 So.2d at 1092. Prejudice may be shown by evidence that an extrinsic factual matter tainted the jury's deliberations. Thus, an adequate demonstration of extrinsic influence upon the jury overcomes the presumption of jury impartiality and shifts the burden to the state to show that the influence demonstrated was not prejudicial. *United States v. O'Keefe*, 722 F.2d 1175, 1179 (5th Cir.1983); *United States v. Howard*, 506 F.2d 865, 869 (5th Cir.1975); *State v. Sinegal*, 393 So.2d 684, 687 (La.1981).

After the trial court's instructions to the jury in the instant case, the jury retired to deliberate. During deliberation, the jurors sent out a note asking to review the Defendant's videotaped interrogation and Mr. Boudreaux's two written statements. After calling the jury back into the courtroom and explaining why their request was denied, the trial court stated:

> I committed an oversight when you retired to deliberate because the alternate, Ms. Knight, you're not supposed to be in there. Your duties are concluded when we reach the end of the trial and we've not lost a regular juror. So you haven't had to replace anybody.
>
> So you are - - your services are complete. So the twelve (12) regular jurors will now retire to the deliberation room to continue your deliberations.
>
> And, Ms. Knight, hang on for one second.

The jury returned to the deliberation room, and Ms. Knight was then sworn in and questioned by the trial court as follows:

> Q    Okay. Ms. Knight, let me first assure you that you've done nothing wrong. What went wrong was totally my responsibility, an oversight by me. You were not supposed to be in the deliberation with the jury. What I was supposed to do was to release you prior to deliberations beginning. So what I want to know now is what - - what

17

happened in the jury deliberation room while you were in there and whether your presence there might have affected the deliberations of the jury. Okay?

A    Okay.

Q    When you all retired to deliberate, did you participate in the discussions with the other jurors about the case?

A    Yes.  Um, - -

Q    And I don't want you to - -

BY THE COURT: Well, let me see counsel just for a second.

BENCH CONFERENCE

BY THE COURT: Ms. Knight, why don't you have a seat in the jury box?

ALTERNATE JUROR COMPLIES WITH REQUEST

BENCH CONFERENCE

THE COURT HAS BEEN ADVISED THAT A VERDICT HAS BEEN REACHED

BY THE COURT: And let's bring them on in.

JURY SEATED

At this time, the jury verdict was read, and each juror was polled.

Next, the trial court addressed the jurors as follows:

BY THE COURT:  Okay.  Ladies and gentlemen, I'm now going to question you about an error that I made, and that is in sending Ms. Knight, the alternate juror, into the deliberation room before I realized my mistake and had her taken out.

I need to know whether her presence in the deliberation room could have had any possible effect on the ultimate verdict, and in particular, any one of your particular votes.

Is there anyone that feels that Ms. Knight's presence and whatever she might have said during the thirty (30) minutes that she was in there had any effect or could have had any effect on any of your votes?  Does

18

anybody feel that way?

ALL JURORS RESPOND NEGATIVELY

BY THE COURT: Can each of you assure me that had you begun the deliberations without the alternate juror, can each of you assure me that the verdict and the vote would have been the same whether she was in there or not? Does anybody feel that it could have been affected in any way, her presence could have affected the vote in any way? If so, please raise your hand and tell me.

NO INDICATION MADE BY JURORS

BY THE COURT: Okay. Let the record show that none have indicated.

And, Ms. Knight, you're here. I'm going to ask you, ma'am, what participation did you have in the deliberation room? Let's go ahead and make a record of the time. The jury retired to deliberate at, I believe, five minutes before five o'clock (5:00). And I addressed the question that the jury had about the exhibits about thirty (30) minutes into your deliberation. And at that point, I removed Ms. Knight.

Ms. Knight, did you participate in discussions during the thirty (30) minutes that you were in there, ma'am?

MS. KNIGHT: I did not participate in any discussion. I only asked a question.

BY THE COURT: And what was it?

MS. KNIGHT: The question I asked was about the picking of the lock, if anybody knew anything about it, anymore than what was said or could make any more sense out of it. And that --

BY THE COURT: Okay.

MS. KNIGHT: And that was it.

BY THE COURT: During the thirty (30) minutes that you were in there, did you express any opinion as to the guilt or innocence of the defendant?

MS. KNIGHT: No, none.

BY THE COURT: Okay. All right. Is that consistent with the memory of all of the jurors about the time, the thirty (30) minutes that Ms. Knight was in there?

ALL JURORS RESPONDED AFFIRMATIVELY

BY THE COURT: Okay. Counsel, any questions of the jurors?

MS. BILLEAUD: No, Your Honor. I'd just like the record to reflect that they all nodded.

The Defendant asserts that the above questioning of the jurors was insufficient to make a determination that the legal presumption of prejudice was rebutted. More specifically, the Defendant complains that the trial court addressed the group as a whole as to whether they were affected by Ms. Knight's presence and did not inquire of specific jurors. The Defendant maintains that the mode of inquiry was not an effective way to gather facts from which the court could infer that there was no influence. The Defendant concludes that the trial court, in effect, was asking the jurors to reach a conclusion for the court on the ultimate issue of prejudice. Further, the Defendant asserts that the presumption of prejudice was a matter of law, that the trial court could not defer the issue to the jury, and that the trial court needed compelling facts to find that the presumption of prejudice did not apply.

We agree that the presence of the alternate juror and the fact that she asked a question during jury deliberation triggers the presumption of prejudice; however, we find that said presumption was adequately rebutted at trial. The trial court addressed Ms. Knight's participation in the jury's discussion and ascertained that she asked only one question about the existence of additional evidence; however, she did not express to the jurors an opinion as to the guilt or innocence of the Defendant. Additionally, the trial court questioned the jurors and confirmed that this was the extent of Ms. Knight's participation in jury deliberation. Lastly, the jurors denied that Ms. Knight's presence and question during jury deliberation had any effect on how they voted. Further, the jurors indicated that, had they begun deliberations without Ms. Knight,

20

each juror's vote would have been the same regardless of Ms. Knight's presence and question.

Although given the opportunity at trial, the Defendant did not question the jurors or offer any evidence to dispute the testimony of the jurors. Further, the Defendant does not point to any statute or jurisprudence, nor are we aware of any legal basis, to conclude that the collective questioning of the jurors was inadequate to rebut the presumption of prejudice. Accordingly, we find this alleged error to be without merit.

## CONCLUSION

The Defendant's convictions for theft of a firearm and possession of a firearm by a convicted felon are affirmed. The trial court is instructed to amend the minutes of sentencing to correctly reflect that it imposed a $1,000.00 fine rather than a $100.00 fine on the Defendant's conviction of possession of a firearm by a convicted felon. Additionally, because the Defendant received an illegally lenient sentence, we amend and correct said illegal sentence and impose upon the Defendant the $1,000.00 fine mandated by La.R.S. 14:67.15. Finally, we sever the Defendant's misdemeanor conviction from his appeal and instruct the Defendant that he must file an application seeking supervisory review with this court within thirty days of this court's opinion if he chooses to seek review of his misdemeanor conviction.

**AFFIRMED AS AMENDED, AND REMANDED.**