LOLLEY, J.
 

 | T Bobby Ray Ingram, II, appeals his conviction and sentence by the 26th Judicial District Court, Parish of Webster, State of Louisiana. Ingram was convicted of manslaughter, a violation of La. R.S. 14:30.1 and sentenced to 28 years’ hard labor. For the following reasons, we remand the matter to the trial court for further proceedings as directed.
 

 Facts
 

 Ingram was charged with second degree murder as a result of the shooting death of his ex-wife, Kimberly “Kim” Ingram on October 18, 2006. The defendant’s first trial ended in a mistrial due to a medical emergency. At the conclusion of his second trial, by a vote of 10-2, the jury voted to convict Ingram of manslaughter on the following evidence adduced at trial.
 

 Ingram and his first wife, Kim, were married for 14 years and had three children. The couple divorced in 2002, and initially they shared the physical custody of their children. In 2006, Ingram remarried; he and his new wife, Nancy Ingram, had one child together. They lived in a rural area north of Minden in the same home where Ingram and Kim lived during their marriage.
 

 Testimony established that Ingram and Kim had a contentious relationship. As a result, Kim was not allowed onto the In-grams’ property, and this acrimonious situation led Ingram and Nancy to build a gate, and then a fence, between the highway and their property. Custodial exchanges of the children were done while Kim was parked outside the gate near the road.
 

 |2On the morning of Wednesday, October 18, 2006, Ingram and Nancy were in Shreveport shopping for a new car. They returned home early that afternoon to a letter they received from Ingram’s attorney relaying new demands from Kim concerning various custody and property matters. In the letter, Kim asked for sole custody of their daughter, her portion of Ingram’s 401K account accrued during their marriage and the return of some
 
 *1129
 
 personal property. In response, Ingram called Kim at her workplace. He told Kim that he withdrew his previous consent to an informal request by Kim to take their youngest child to Kim’s high school reunion on the upcoming weekend, a weekend when he would normally have physical custody of the child. He also told Kim that he was not going to be able to give their oldest son a ear because he would need additional money to pay a lawyer to fight Kim’s demands. Reportedly, Kim asked Ingram to keep the children out of their disputes.
 

 After this call ended, Kim then called Ingram’s residence seven times from 1:15 p.m. until 1:58 p.m. Nancy and Ingram ignored most of these calls, but finally Nancy answered the phone, at which point Kim demanded to know the whereabouts of her oldest son who was living with Nancy and Ingram. Nancy told Kim that the young man was not there. Nancy testified that Kim said that when she was finished with her client (Kim was a hairdresser in Minden), she would be on her way to see Nancy and Ingram. Neither Nancy nor Ingram went out to lock their gate; Nancy testified that she did not do so “because of numerous times she threatened me she didn’t follow up on it after I had her arrested at my salon.”
 

 | RAbout twenty minutes later, Kim drove up to the Ingram’s home and parked at the end of the driveway near the highway. When she arrived, Kim called the house again and Nancy answered the phone. Nancy testified that “She [Kim] said she was going to wait at the end of the driveway until I left and then she — once I got on public property she was going to kick my ass.” Nancy then told Kim to “come on down the - driveway.” Nancy testified that she made this statement to Kim in an effort to have Kim arrested for threatening her. Kim waited in her car at the end of the driveway for several minutes and then Nancy called Kim back and told her to leave. At that point, Kim told Nancy that she was going to wait there until her oldest son arrived home on the school bus. Nancy testified that Kim demanded that Nancy come out to her “so she could kick [Nancy’s] ass.”
 

 Kim then drove her car down the In-grams’ long driveway and skidded to a stop in the front yard only a few feet from the front door. Kim got out of her car, leaving her purse inside and leaving the driver’s side door open, and came up onto the front porch of the Ingrams’ residence. Nancy saw Kim through a front window and called out to Ingram, who was in the kitchen, saying “She’s here.”
 

 The Ingrams’ front entranceway had two doors: a glass storm door and a wooden main door. The wooden main door was open, and the storm door was shut. Nancy testified that she walked up to the storm door and cracked it open “a few inches” to speak with Kim. Nancy testified that she never left the residence. At this time, according to Nancy, Kim was standing outside the house on the front porch but at the storm door. When hNancy opened the storm door, she said to Kim “I’ve had it,” and Kim responded “I’ve had it.” Nancy testified that she and Kim then called each other “bitches,” that Kim called Nancy a whore, and that Nancy told Kim to leave. Nancy never saw Kim with a weapon.
 

 In the meantime, Bobby Ray called 911; the call was received at 2:45 p.m. An audio recording of this conversation was admitted into evidence along with two different transcripts.
 
 [1]
 
 Phone records show that the
 
 *1130
 
 Ingrams received a call from a car dealership immediately thereafter, which call only lasted a few seconds and then disconnected.
 

 During Nancy and Kim’s argument, the dispute became physical, and the women began fighting on the floor inside the house at the threshold just inside the front door. Nancy testified that Kim knocked her to the floor and then proceeded to hit Nancy and pull her hair. At trial, Nancy further explained that Kim was on top of her and that she (Nancy) was trying to protect her face by putting her arms up.
 

 Ingram testified that he was still in the kitchen on the phone when he heard Nancy make “a blood-curdling scream” and heard “a loud bang” so he hung up with 911 and grabbed the deer rifle that had been left in the kitchen after a recent hunt. He said he went into the hallway where he saw the two women on the floor. He said that “She (Kim) was holding her (Nancy) with one hand and hitting her with the other, and Nancy was screaming.” At that point, Ingram called out to Kim. Ingram testified:
 

 | SI didn’t think, I just, I ran, I grabbed her [Kim], I think I was screaming “get off of her, get off of her, get out.” I grabbed her [Kim] by the hair and I pulled up, and when I pulled up, I guess she pulled up on Nancy and Nancy screamed louder and I let go and it got her attention off of Nancy, and then she lunged at me and I was pulling back and I fired.
 

 Ingram further explained that “[W]hen I [let go], Kim turned up and lunged towards me, or made an aggressive motion towards me, and I pulled back and I fired.” He said that the rifle was at his hip when he fired. Nancy said that she wasn’t able to see up until Ingram pulled Kim up and off of her; she explained that when she was finally able to see, she saw only her husband’s side and the rifle. Nancy testified that, “I saw Bob’s eyes got big like he got scared and jump, jumped back, and I felt pressure back on my legs like maybe she [Kim] was coming forward, and then the gun went off.” During the investigation on the day of the shooting, Nancy denied seeing Kim reach for the gun.
 

 The bullet struck Kim in the bottom of her right arm, perforated the arm and entered her upper right torso through her right breast. The bullet destroyed the breast implant in that breast and then traveled upward through her torso into her heart. The bullet fragmented and did not exit her body. Kim Ingram was dead.
 

 Immediately, Ingram called 911; the call was received at 2:46 p.m. — only one minute after the first call was received. His first statements to the dispatcher were: “Yeah, she came in the house and she started fighting and I shot her! I need an ambulance quick!” Nancy took the phone | (¡from Ingram and relayed to him instructions from the dispatcher about giving CPR. Neither he nor the paramedics who arrived shortly after the 911 call were able to revive Kim.
 

 During the second conversation with 911, the dispatcher asked Nancy if she was injured, to which Nancy replied “[S]he came in and attacked me, I mean, I might have some scratches on me but I’m not injured.” Subsequent photos of Nancy showed that she had what appears to be fingernail scratches on her upper chest.
 

 The photos of Kim taken at the scene show her body entirely within the home, at the front door, lying on her back with her
 
 *1131
 
 head near the door. She has what appear to be small pieces of tissue covering her jeans from her waist down to her knees. The photos also show that the front of the right leg of Kim’s jeans was wet from her upper thigh down to her knee.
 

 As noted, the jury convicted Ingram of manslaughter. The defense filed a post-verdict motion for acquittal, urging that the evidence showed that the shooting was done in self-defense. The trial court denied this motion stating its belief that viewing the evidence in the light most favorable to the State, the jury concluded that Kim Ingram’s entry into the home was lawful based on Nancy’s invitation to “come on down the driveway.”
 

 Ingram also filed a motion for a new trial, citing four grounds. First, he contended that the verdict was contrary to the law and evidence. Ingram argued that the evidence was insufficient to support the verdict. Second, he maintained that the trial court’s admission of the laboratory drug test report |7into evidence over Ingram’s objection was error. Third, he urged that juror misconduct during deliberations necessitated a new trial, or at the least an evidentiary hearing on the issue (which request the trial court denied). Finally, Ingram argued that the ends of justice would be served by granting a new trial. The defendant argued that the state’s forensic expert had no factual basis to support his opinion that Kim was in a defensive posture when she was shot. Further, the defense argued that the prosecutor’s change to the 911 transcript was prejudicial. Finally, the defense alleged that the prosecutor, Sherburne Sentell, III, had a personal relationship -with Kim and had used the power of his office to, among other things, “quickly [dispose] of a pending drug charge against Barre Simpson,” Kim Ingram’s boyfriend. The trial court denied Ingram’s motion for new trial.
 

 At sentencing, the trial court indicated that it had reviewed the presentence investigation report prepared in this matter along with various letters, including a letter from Ingram, and a presentence memo from the defense. The trial court observed that Ingram was 40 years old and that his only prior criminal record was a single traffic violation. The defendant had lived in Minden since he was in high school, had served with the Army National Guard and had an extensive and steady work history. The trial court noted that the many letters sent to it were “about half-and-half’ in favor of and opposed to harsh punishment for Ingram and that Ingram’s children were among those who were opposed to a long jail sentence.
 

 The trial court took into account the great suffering of Ingram’s children, but noted that Ingram had shot an unarmed woman at close range |Rwith a high-powered rifle. The court stated that it found several factors in support of a longer sentence: a lesser sentence would deprecate the seriousness of the crime; Ingram was in need of correctional treatment that could be provided most effectively by his commitment to an institution; Ingram used violence in the commission of the offense; and, Ingram should have contemplated that his conduct would cause serious harm.
 

 In mitigation, the trial court found that Ingram had no criminal history and that his imprisonment will, in many respects, entail an excessive hardship on his dependents. For those reasons, the court sentenced Ingram to serve 28 years’ imprisonment at hard labor, and Ingram subsequently filed a motion to reconsider sentence. The trial court denied the motion, and Ingram now appeals.
 

 
 *1132
 
 Discussion
 

 Ingram rafees several assignments of error, discussion of which are pretermit-ted due to the issue of potential juror misconduct at the trial. On that issue, Ingram argues that the trial court mishandled his motion for new trial and urges that the trial court should have granted, in the least, his request for an evidentiary hearing because of events that transpired with the jury near the close of trial. Considering the extraordinary facts alleged by Ingram regarding this assignment of error which appear to be unique in Louisiana jurisprudence on the issue of juror misconduct, we conclude that the trial court erred in failing to conduct an evidentiary hearing on the matter.
 

 |9In his memo in support of his motion for new trial, Ingram stated:
 

 The facts set forth in this motion were discovered by defendant’s attorneys on August 21, 2009, and could not have been discovered by any means available to defendant or his attorneys prior to the return of the verdict. The source of the factual allegations set forth in this motion is a juror, who, on his/her own initiative, contacted defendant’s attorney, A.M. Stroud, III (footnote omitted).
 

 On Saturday, August 15, 2006[sic], the trial of this matter was still ongoing. During the lunch recess, the juror seated in the second row, seat 8 (hereafter, “Juror No. 8”), made an unauthorized entry of a dwelling, while armed with a baseball bat, for the purpose of confronting her boyfriend, who was present in the dwelling with another woman. She threatened bodily harm if the boyfriend did not leave and if the other said anything. She then left the house and returned to jury duty. Juror No. 8 then shared the facts related to her unauthorized entry of a dwelling with other members of the jury, before and/or during deliberations.
 

 During deliberations, another juror pointed out that Juror No. 8 was in a position similar to Kimberly Ingram, in that she had entered, in an aggressive and unlawful manner, the home of another without permission and Juror No. 8 agreed. Ultimately, Juror No. 8 voted to convict defendant of second degree murder.
 

 Ingram argued that this juror’s statements to the other jurors “irrevocably tainted the jury’s deliberations by causing extraneous matters unrelated to the evidence to be considered during the process of jury deliberations, and in particular created the substantial risk that other members of the jury would perceive that if they determined that defendant was not guilty on the basis of justifiable homicide, they would be implicitly, if not explicitly, condemning Juror No. 8’s conduct.”
 

 1inThe trial court held a hearing on Ingram’s motion for new trial, which additionally contained a request for an eviden-tiary hearing to consider the matter of this juror’s alleged conduct. The trial court allowed Ingram to make a proffer in conjunction with his motion, which proffer stated in part:
 

 [Juror No. 8] would have been called to inquire about her actions as related to counsel by the foreman of the jury. Specifically, she would have been asked about the “baseball bat” incident involving her boyfriend and another woman, occurring while she served as juror.
 

 In addition, Ingram proffered the affidavit of the jury foreman, which stated in part:
 

 AFFIANT also advised [defense counsel] that a female juror had been telling others during recesses that she suspected her boyfriend was having an affair and was taking advantage of her service
 
 *1133
 
 on the jury in order to visit with his suspected paramour.
 

 On Saturday, August 15, 2009, the trial of this matter was still ongoing. AFFIANT related that the juror, during the lunch recess, made an unauthorized entry into the house of the alleged paramour. The juror made the entry while armed with a baseball bat. The juror found the boyfriend in bed with the other woman, therefore confirming her suspicions. She then told the woman to be quiet and listed [sic] to what she had to say. After telling her boyfriend she would deal with him later, she left and returned to jury service.
 

 AFFIANT indicated that the juror acknowledged to him and others that she had placed herself in the same position as Kimberly Ingram, as both had entered homes without authority.
 

 AFFIANT believes that this external matter disrupted the subsequent deliberations of the jurors, allowed the jurors the benefit of a “recreation” of the crime, and more importantly, allowed them to use this evidence in its deliberations to compare the juror’s position at the house she entered to that of Kim Ingram; i.e., the juror lived; Ms. Ingram did not.
 

 Ultimately at the hearing on Ingram’s motion, the trial court denied his motion for new trial on this issue concluding that Juror No. 8’s fy statements were essentially those of the juror’s personal experiences like those in
 
 State v. Sanders,
 
 33,778 (La.App.2d Cir.10/04/00), 769 So.2d 183, and not the sort of extraneous or outside influences contemplated by La. C.E. art. 606(B), which provides:
 

 B. Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury’s deliberations or to the effect of anything upon his or any other juror’s mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury’s attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.
 

 In
 
 Sanders, supra,
 
 the defendant was convicted of attempted murder as a result of a drive-by shooting. On appeal, the defendant claimed that his jury was improperly influenced by the comments of one juror, relayed to the other jurors, about his own experience as the victim of a drive-by shooting and his medical knowledge about the type of injury suffered by the victim. In
 
 Sanders,
 
 we rejected the defendant’s argument of juror misconduct, stating, in part: “Essentially, an impermissible ‘outside influence’ is an unauthorized communication or overt act by a third party which creates an extraneous influence on the jury. However, even if such acts occur they are subject to harmless error analysis.”
 
 Id.
 
 at 187 (citation omitted). Whereas a trial court’s decision on a motion for new trial rests within the sound discretion of the trial judge, we believe that the trial court’s complete reliance on
 
 Sanders,
 
 without first conducting an evi-dentiary hearing to flesh |1?out the facts behind these very serious allegations, was an abuse of discretion considering the unique situation of this particular case.
 

 Notably, in and of itself, juror misconduct is not grounds for an automatic
 
 *1134
 
 mistrial; prejudice must also be established.
 
 State v. Day,
 
 414 So.2d 349 (La.1982);
 
 State v. Richardson,
 
 33,272 (La.App.2d Cir.11/01/00), 779 So.2d 771,
 
 writ denied,
 
 2000-3295 (La.10/26/01), 799 So.2d 1151. However, we observe the holding in a writ opinion by the Louisiana Supreme Court in
 
 State v. Barber,
 
 1997-2749 (La.04/24/98), 708 So.2d 1054. In that case, from the limited facts stated by the supreme court, it appears that alternate jurors were present during deliberations. As a result thereby, the case was remanded to the trial court for an evidentiary hearing to determine if the outcome was affected by the presence of alternate jurors and to what extent the outcome was affected. In rendering its ruling, the supreme court in
 
 Barber
 
 relied on La. C.E. art. 606(B), and concluded as follows:
 

 Louisiana courts are “required to take evidence upon well-pleaded allegations of prejudicial juror misconduct....”
 
 State v. Graham,
 
 422 So.2d 123, 131-132 (La.1982);
 
 State v. Horne,
 
 679 So.2d 953, 958 (La.App.2d Cir.08/21/96),
 
 writ denied,
 
 688 So.2d 521 (La.02/21/97);
 
 State v. Sanders,
 
 539 So.2d 114, 121 (La.App. 2d Cir.),
 
 writ denied,
 
 546 So.2d 1212 (La.1989);
 
 State v. Duncan,
 
 563 So.2d 1269, 1272 (La.App. 1st Cir.1990);
 
 See also State v. Searile,
 
 643 So.2d 455, 457-458 (La.App. 3rd Cir.10/05/94). At the conclusion of the hearing, the trial court shall determine whether a new trial or other appropriate relief is required, reserving to the parties a right to seek review of the ruling.
 

 See also, State v. Anderson,
 
 2008-962 (La.App. 3d Cir.02/04/09), 2 So.3d 622,
 
 writ denied,
 
 2009-0518 (La.11/20/09), 25 So.3d 786.
 

 11sThe instant case is a strikingly atypical case of jury misconduct and definitely distinguishable from
 
 Sanders, supra.
 
 Here, a juror allegedly committed a crime
 
 during the course of the trial,
 
 which crime was reminiscent of the facts of the case being tried. Had this case been truly analogous to
 
 Sanders,
 
 this juror’s actions would have occurred prior to Ingram’s trial, and she would have potentially brought her life experience with her to the trial. Counsel for both parties would have had the opportunity to question the juror during voir dire and make a determination of whether they considered her a suitable juror despite her life experiences. Instead, as alleged by Ingram, Juror No. 8, while in the midst of the trial committed a home invasion herself and then, living to tell about it, allegedly returned to the jury room and shared her experience with other jurors. Notably, the jury is the fact-finder and the judge of the witnesses’ credibility. The jury’s fact-finding process is seriously called into question when one of the jurors — allegedly—commits a crime during the trial and then comes back and relates it to the rest of the jury, and the jury then discusses the similarity between the juror’s actions and the instant case.
 

 Because this is such a novel situation and because Ingram clearly may have been prejudiced by the conduct of Juror No. 8 if the allegations are determined to be true, the most cautious and reasonable course of action by the trial court would have been to hold an evidentiary hearing to determine what happened with Juror No. 8 and the other jurors. Although the result may ultimately be unfavorable to Ingram (i.e., if the trial court determines after an evidentiary hearing that there was no juror misconduct or that even 114if there was, Ingram was not prejudiced), to proceed without considering this issue is the sort of thing that serves to undermine the public’s confidence in the criminal justice system. If true, the allegations made concerning Juror No. 8’s actions during the final stages of Ingram’s trial merit serious consideration. Failure to hold an eviden-
 
 *1135
 
 tiary hearing to inquire into the facts surrounding the allegations which sound prejudicial on their face was clearly in error.
 

 Conclusion
 

 Considering the foregoing, this case is remanded to the trial court for an eviden-tiary hearing to determine whether or to what extent the alleged conduct by Juror No. 8 may have been an improper extraneous influence on the jury which served to prejudice Bobby Ray Ingram. At the conclusion of the hearing, the trial court shall determine whether Ingram is entitled to a new trial as a result of juror misconduct or other appropriate relief is required, reserving to the parties the right to seek review of the ruling.
 
 See State v. Barber, supra.
 

 REMANDED FOR FURTHER PROCEEDING.
 

 [1]
 

 . The fact that two different transcripts exist is an issue raised by Ingram on appeal. Apparently, between the first and second trials, the assistant district attorney made a slight
 
 *1130
 
 change to the 911 call transcript without informing defense counsel. The altered transcript did not come to light until the second trial of the matter, and Ingram argues that as a result of the altered transcript he is entitled to a new trial.