57 So.3d 299 (2011)
STATE of Louisiana
v.
Bobby Ray INGRAM, III.
No. 2010-K-2274.
Supreme Court of Louisiana.
March 25, 2011.
PER CURIAM.
The state charged defendant by grand jury indictment with second degree murder in violation of La.R.S. 14:30.1, after he shot his ex-wife, Kimberly Ingram, in his home on October 18, 2006. Defendant had three children with Kimberly, and they had been married for 14 years before the marriage dissolved and they divorced. At the time of the shooting, defendant was married to Nancy Ingram, who was in the home at the time of the fatal confrontation between defendant and his ex-wife. After trial by jury, defendant was convicted of manslaughter in violation of La.R.S. 14:31. The trial court sentenced him to 28 years' imprisonment at hard labor. Defendant appealed his conviction and sentence to the Second Circuit, urging several assignments of error. However, the court of appeal addressed only a single issue: *300 whether the trial court erred in summarily denying defendant's motion for a new trial based in part on allegations of juror misconduct occurring during the jury's deliberation. State v. Ingram, 45,546 (La.App. 2nd Cir.9/22/10), 47 So.3d 1127. The court of appeal set aside that ruling and ordered an evidentiary hearing on the issue. The state sought review of that decision in this Court and for the reasons that follow, we reverse and remand the case to the court of appeal for consideration of defendant's remaining assignments of error. The fatal confrontation between defendant and his ex-wife brought to an end a contentious relationship involving disputes over custodial exchanges, property, and financial matters, that followed dissolution of the marriage. The relationship with his ex-wife had deteriorated so badly that defendant erected a fence around his home, and by arrangement, Kimberly Ingram picked the children up while parked outside of the gate. On the day of the shooting, defendant and Kimberly had quarreled over the telephone in an argument precipitated by defendant's receipt of Kimberly's demands to settle remaining aspects of the community property division left open at the time of their divorce. Defendant ignored Kimberly's repeated return calls, which were eventually answered by Nancy Ingram. The two women had words, and the dispute continued when Kimberly arrived at the house to wait at the gate for her oldest son to come home by school bus. The women first exchanged words over their phones, and then, after Kimberly challenged Nancy to come out so she could "beat her ass," and Nancy responded, "Whatever," defendant's ex-wife drove through the unlocked gate and up the long driveway to the house.
The give and take of threats and curses between the two women continued at the front of the house through a storm door to the main entrance which Nancy Ingram had cracked open a few inches. Words eventually escalated into physical violence when Nancy turned to see whether defendant had called the police. Kimberly pushed open the door and pounced on Nancy Ingram, driving her to the floor as she fell on top of her. Kimberly began pulling on Nancy's hair while Nancy struggled beneath her. In the meantime, defendant, who had called 911 from the kitchen when he first heard a crash at the door and the scream of his wife, grabbed his high-powered deer hunting rifle and raced to the women sprawled on the floor by the front door. Defendant testified that he approached his ex-wife with the rifle at his hip and grabbed Kimberly by her hair to pull her off of Nancy. Kimberly turned in his direction and lunged at him. Defendant pulled back and fired a single shot from what one of the investigating officers described as a "big game rifle." The bullet tore through Kimberly's right arm and struck her in the chest, killing her. The defense went to the jury on the theory that the law entitled defendant to meet force with force in defense of his home, his wife, and himself, against the uninvited and unauthorized entry by Kimberly. The trial court charged jurors with respect to the legal principles underpinning that defense at the close of the evidence, instructing them in accord with La.R.S. 14:20(A)(4)(a), that "[a] homicide is justifiable if the defendant was lawfully inside a dwelling and killed a person who made or was attempting to make an unlawful entry into the dwelling and the defendant reasonably believed that the use of deadly force was necessary to prevent the entry or to compel the intruder to leave the premises."
Following the jury's verdict of manslaughter, which both sides argued against in their closing remarks, defendant filed a motion for a new trial based in part on an *301 affidavit executed by the jury foreman regarding the course of jury deliberations. The foreman generally expressed concerns about certain aspects of the deliberations but specifically focused on a juror identified by the court of appeal in its decision as Juror No. 8. The affidavit stated that during recesses as the trial proceeded, Juror No. 8 had informed other jurors on the panel that she suspected her boyfriend was having an affair and was taking advantage of her service on the jury to visit his paramour. Acting on her suspicions, Juror No. 8 had armed herself with a baseball bat over a noon lunch recess during the evidentiary portions of the trial and "made an unauthorized entry into the house of the alleged paramour." She found her boyfriend in bed with the woman. Juror No. 8 told the woman to remain still and listen to her. She also informed her boyfriend that she would deal with him later. The confrontation apparently ended at that point. The jury foreman further explained in his affidavit that Juror No. 8 "acknowledged to him and others that she had placed herself in the same position as Kimberly Ingram, as both had entered homes without authority." Finally, the foreman alleged that the incident allowed the other jurors to have "the benefit of a 'recreation' of the crime, and more importantly, allowed them to use this evidence in its deliberation to compare the juror's position at the house she entered to that of Kim Ingram; i.e., the juror lived; Ms. Ingram did not."
In arguing his motion, defense counsel addressed the potential impact the information provided by Juror No. 8 may have had on the jury as a whole and the likelihood that it would have caused other jurors to consider whether, by accepting defendant's claim of justification, they would be "criticizing this juror for what she's done." Counsel also focused on the impact the incident may have had on Juror No. 8 herself, and how it may have impaired defendant's "unquestioned right to twelve non-partial jurors." At the same time, counsel conceded that "we shouldn't be able to call witnesses and question them about how they ultimately went through the deliberative process." Counsel's goal therefore was simply to question jurors with respect to what "did you learn about this, did this occur, was it brought to your attention during the jury process."
The trial court denied the motion without conducting a hearing on the claim. The trial court assumed for purposes of ruling on the motion that the allegations in the foreman's affidavit were true, although the prosecutor would not subscribe to that view because "[t]hat's not we had been reported as actually occurred." The court found that as alleged in the affidavit, Juror No. 8 had simply "relayed a personal experience and not some extrinsic facts that could be construed as an extraneous or an outside influence," for purposes of Louisiana's jury shield provisions in La.C.E. art. 606(B), which generally preclude inquiry into the course and conduct of a jury's deliberations, but which make exceptions for cases in which "any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention."
The court of appeal flatly disagreed with that assessment and remanded the case to the district court to conduct an evidentiary hearing on the allegations in the foreman's affidavit. For the Second Circuit panel, the present case offered "a strikingly atypical" example of juror misconduct because "a juror allegedly committed a crime during the course of the trial, which crime was reminiscent of the facts of the case being tried," and then related the incident to the rest of the jurors, thereby calling the jury's fact-finding process into serious *302 question. Ingram, 45,546 at 13, 47 So.3d at 1134. The panel therefore concluded that it was worth breaching the jury shield rule of La.C.E. art 606(B) to establish the full facts of the incident and the extent to which it became the focus of attention during deliberations, although ultimately defendant might not be entitled to any relief, because the costs of conducting such a hearing appeared far less than the costs to public confidence in the criminal justice system if the hearing were not conducted. Id., 45,546 at 13-14, 47 So.3d at 1134 ("Because this is such a novel situation and because Ingram clearly may have been prejudiced by the conduct of Juror No. 8 if the allegations are determined to be true, the most cautious and reasonable course of action by the trial court would have been to hold an evidentiary hearing to determine what happened with Juror No. 8 and the other jurors. . . . [T]o proceed without considering this issue is the sort of thing that serves to undermine the public's confidence in the criminal justice system."). At the same time, the court of appeal did not address the scope of the evidentiary hearing it ordered. In fact, the defense proffer submitted at the hearing on the motion for a new trial listed only a single juror that the defense had intended to call at the hearing, Juror No. 8, whom counsel identified by name.
As a general rule, "[j]urors are not expected to come into the jury box and leave behind all that their human experience has taught them." Beck v. Alabama, 447 U.S. 625, 642, 100 S.Ct. 2382, 2392, 65 L.Ed.2d 392 (1980)(internal quotation marks and citation omitted). Individual jurors "bring to their deliberations qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable." McCleskey v. Kemp, 481 U.S. 279, 311, 107 S.Ct. 1756, 1777, 95 L.Ed.2d 262 (1987)(internal quotation marks and citation omitted). For the most part, how jurors may draw on their experience in the deliberative process remains shielded from view and therefore largely unknowable. Louisiana subscribes to the common law rule, incorporated in La.C.E. art. 606(B), that jurors may not impeach their verdict by evidence of their own misconduct. The rule incorporates important systemic values, including the finality of judgments, and allows only the narrow exceptions for outside influences or extraneous prejudicial information. See Tanner v. United States, 483 U.S. 107, 119, 107 S.Ct. 2739, 2747, 97 L.Ed.2d 90 (1987)(tracing Fed. R.Evid. 606(b), progenitor of La.C.E. art. 606(B), back to its origins in the common law and finding that nothing in the rule appeared inconsistent with the Sixth Amendment guarantee of a fair and impartial jury, observing that "[s]ubstantial policy considerations support the common-law rule against the admission of jury testimony to impeach a verdict. . . . The Court's holdings requiring an evidentiary hearing where extrinsic influence or relationships have tainted the deliberations do not detract from, but rather harmonize with, the weighty government interest in insulating the jury's deliberative process."). As the trial court in the present case was keenly aware, jurors generally remain free to share what their experience and knowledge has taught them, even in situations similar to the circumstances of the crime for which they are empaneled, without calling into question the validity of their verdict. See, e.g., State v. Sanders, 33,778, pp. 4-5 (La.App.2d Cir.10/4/00), 769 So.2d 183, 187 (in trial for a drive-by shooting in which the victim lost his spleen, jury foreman remained free to discuss his personal experience as the victim of a drive-by shooting and conveyed information gleaned from his wife, a nurse, about the difficulties of living without a spleen).
*303 However, in exceptional cases, jurors themselves may be the source of extraneous prejudicial outside information as well as third parties. See, e.g., Jeffries v. Wood, 114 F.3d 1484, 1490 (9th Cir. 1997)("When a juror communicates objective extrinsic facts regarding the defendant or the alleged crimes to other jurors, the juror becomes an unsworn witness within the meaning of the Confrontation Clause. . . . That the unsworn testimony comes from a juror rather than a court official does not diminish the scope of a defendant's rights under the Sixth Amendment."); United States v. Swinton, 75 F.3d 374, 381 (8th Cir.1996)("[T]he inquiry is not whether the jurors `became witnesses' in the sense that they discussed any matters not of record but whether they discussed specific extra-record facts relating to the defendant, and if they did, whether there was a significant possibility that the defendant was prejudiced thereby.")(internal quotation marks and citation omitted).
In one such case, State v. Graham, 422 So.2d 123, 131 (La.1982), this Court observed that Louisiana's jury shield rule [then former La.R.S. 15:470] "must yield and . . . our courts are required to take evidence upon well pleaded allegations of prejudicial juror misconduct violating an accused's constitutional right to due process, to confront and cross-examine witnesses or to a trial by a fair and impartial jury and to set aside the verdict and order a new trial upon showing that a constitutional violation occurred and that a reasonable possibility of prejudice exists." Graham involved an experiment in blood coagulation conducted by two jurors during a break in the trial of the defendant for second degree murder as a means of testing the opinion testimony offered by a state's expert regarding blood spatters found on defendant's clothing and how and when they may have originated. The experiment potentially impacted the defendant's right to confront and cross-examine the witnesses against him and invited jurors to go beyond the record evidence introduced at trial in reaching a decision.
Nevertheless, this Court ultimately determined that because the experiment did not "represent a radical departure from our expectations that a juror will employ his own ordinary experience in the deliberation," and thus, "did not involve jurors conducting tests of matters beyond their normal ken or going outside the jury room to obtain esoteric knowledge or special information pertaining directly to the case," there was no "reasonable possibility that the jurors experiment contributed decisively to the guilty verdict." Graham, 422 So.2d at 132-33. We thereby considered "the magnitude of the juror's deviation from his proper role, the degree to which the accused was deprived of the benefits of the constitutional and statutory safeguards, and the likelihood that the impropriety influenced the jury's verdict." Id., 422 So.2d at 132. We also conducted the analysis on an entirely objective basis. Id. ("Because the accused is not required to show actual prejudice, the state may legitimately invoke the prohibition of [former] R.S. 15:470 to bar inquiry into the mental processes of an individual juror.").
In the present case, as in Graham, the conduct at issue occurred during trial, and, as the defense emphasized below, at a time when voir dire examination of the juror could not have revealed a potential source of bias or interest in the case. Nevertheless, the court of appeal erred in ordering an evidentiary hearing for two reasons. First, the trial court had before it a detailed affidavit by the jury foreman setting forth the information conveyed by Juror No. 8 with respect to the confrontation with her wayward boyfriend after the unauthorized entry of the paramour's home. Although the prosecutor did not subscribe *304 to that version of the event, the trial court assumed for purposes of ruling on the defense motion that the factual circumstances of the confrontation were as Juror No. 8 alleged them. Thus, it remains unlikely that the testimony of Juror No. 8, or any of the other jurors on the panel, including the foreman, could substantially add to the factual basis for the new trial claim, and, as Graham makes clear, and as defense counsel conceded in arguing his motion, no juror on the panel could testify as to the actual impact of that information on the deliberations, i.e., that jurors considered the incident a recreation of the crime charged against defendant and allowed them to compare the respective positions of Juror No. 8 and Kimberly Ingram and their respective fates, that one woman died while the other woman lived, in reaching their verdict.
Second, the trial court correctly ruled that even as alleged, the conduct of Juror No. 8 did not give rise to a reasonable possibility that the information she conveyed contributed significantly to the jury's verdict. Reasonable jurors would not have understood Juror No.'s conduct as an attempt to recreate the crime charged against defendant, as she had clearly acted on her own impulses in her own private life. Thus, unlike the situation in Graham, the juror's conduct did not represent an experiment in an attempt to test evidentiary propositions put at issue during the trial and did not implicate defendant's Sixth Amendment right of confrontation and cross-examination, or invite the other jurors to look beyond the evidence presented at trial for evidence on which to base their verdict. Nor did her information convey extra-record facts about defendant which might have prejudiced him, or touch upon esoteric matters beyond the ken of the other jurors' common understanding and experience. In assessing whether defendant had been entitled to meet "force with force," as a matter of home defense, reasonable jurors might well consider that Juror No. 8 emerged unscathed after arming herself for trouble and entering the home presumably of a stranger, while Kimberly Ingram died unarmed in her former marital domicile she had shared with defendant in the course of a 14-year marriage. On the other hand, although Juror No. 8 had armed herself with a baseball bat that could have been used as a dangerous weapon, she did not, by her own accounting, lose her self-control and attack either her erring boyfriend or his paramour, unlike Kimberly Ingram, who, according to Nancy Ingram and defendant, lost all self-control, became the aggressor, and physically attacked defendant's current wife in the cumulating event of a long simmering conflict with her ex-husband fueled, at least in defendant's opinion, by her jealousy of Nancy Ingram. If anything, Juror No. 8's personal experience shared with jurors focused attention on the evidence offered at trial, and on the critical question posed by the defense of the case, whether the conduct of Kimberly Ingram after she crossed the threshold of defendant's home gave rise to a reasonable belief "that the use of deadly force [was] necessary to prevent the entry or to compel the intruder to leave the premises. . . ." La.R.S. 14:20(A)(4)(a). To this extent, communication of Juror No. 8's personal experience to the other jurors did not implicate the fundamental fairness of the trial or undermine confidence in a verdict that neither the state nor defense, wanted, but which accounted for the origins of the incident in the fallout of a failed marriage.
As for the impact of the incident on Juror No. 8 herself, the defense argued below that the juror would inevitably identify with Kimberly Ingram, rendering her *305 unable to consider impartially the defense offered at trial, and that her experience had thereby deprived defendant of his right to trial by 12 impartial jurors, an error not rendered harmless by the jury's non-unanimous 10-2 verdict because the influence of Juror No. 8's partiality, as revealed by her dissenting vote along with the jury foreman, on the course of deliberations is essentially unknowable. See Parker v. Gladden, 385 U.S. 363, 365, 87 S.Ct. 468, 471, 17 L.Ed.2d 420 (1966)(Oregon, as does Louisiana, may allow 10/2 jury verdicts, but bailiff's prejudicial comments to two jurors were not harmless although 10 jurors voted to convict and did not hear the comments because "petitioner was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors.")(citing State v. Murray, 164 La. 883, 888, 114 So. 721, 723 (1927)).
Defendant's argument relies heavily on the decision in Brooks v. Dretke, 418 F.3d 430 (5th Cir.2005), in which a juror in a capital case, just as the penalty phase was about to begin, was arrested as he entered the courthouse with a gun. The arrest was not revealed to the other jurors but was disclosed to the trial judge, who questioned the juror and obtained his assurances that the arrest would not impair his ability to render a fair and impartial sentencing verdict. Those responses satisfied the trial judge and the juror remained seated on the jury panel, which returned a sentence of death. After exhausting his state direct appeal and post-conviction remedies, defendant sought federal habeas corpus relief. The Fifth Circuit ultimately reversed the judgment of the district court denying federal habeas and remanded with instructions on grounds that the compromising position the juror had found himself in for the remainder of trial, i.e., he faced the state responsible for deciding whether to prosecute him for the firearms offense, supported a finding of implied bias and required setting aside the sentence. Brooks, 418 F.3d at 435.
However, in the present case, defendant makes no claim that Juror No. 8 had been arrested following her unauthorized entry and thus faced an actual conflict of her duties as a juror and her self interest in resolving her own difficulties with the state. In fact, Juror No. 8's responses during voir dire examination revealed more potent sources of potential bias that ultimately did not result in her exclusion from the jury panel. Out of the presence of other prospective jurors, Juror No. 8 acknowledged that previously she had been arrested and charged with felony theft. The case was resolved by her guilty plea to misdemeanor theft and a sentence which included restitution. The prosecutor in that case was the same Assistant District Attorney who prosecuted defendant in the present case. Juror No. 8 stated that her prior difficulty with the law would not influence her decision one way or the other. With respect to the prosecutor, the juror stated that she had no hard feelings because she "regretted it myself" and it "was just something . . . that I paid for and that, that was it."
In addition, Juror No. 8 confided that she had been in an abusive domestic situation with the father of her five-year old daughter. Physical blows had been struck "on a regular basis," the police had been called on several occasions, and her boyfriend had been arrested twice. Asked directly by defense counsel whether the experience would incline her to favor a wife over a husband in a situation arising from some kind of domestic dispute, Juror No. 8 stated that she "could be impartial. . . . I'm not going to tell you that it kind of wouldn't just strike a nerve, but I believe I could still be impartial." By accepting Juror No. 8 on the panel, both state and defense took at face value her *306 assurances of impartiality, and her commitment to deciding the case on the evidence presented and the instructions of the trial court. Thus, neither side presumed that the juror's prior experiences, particularly as the victim of repeated domestic violence, would decisively influence her verdict. In this context, we will not presume that the subsequent encounter of Juror No. 8 with her straying boyfriend and his paramour had any greater affect on her capacity to render a fair and impartial verdict according to the law and the evidence.
The decision of the court of appeal is therefore reversed, and this case is remanded for consideration of defendant's remaining assignments of error argued on appeal.
DECISION OF COURT OF APPEAL REVERSED; CASE REMANDED.
KNOLL, J., dissents for reasons assigned by Justice Weimer.
WEIMER, J., dissents and assigns reasons.
KNOLL, J., dissents.
I dissent for the reasons assigned by Justice Weimer.
WEIMER, J., dissents.
I respectfully dissent believing the court of appeal was correct in ordering a hearing in this unique and unprecedented case, which involves a juror advising fellow jurors about engaging in allegedly criminal conduct during the trial. The "jury shield statute," LSA-C.E. art. 606(B), provides for an exception in criminal cases when "extraneous prejudicial information was improperly brought to the jury's attention."
The juror in this case was caught in a conflict between her duty as a juror and her self-interest which potentially compromised her ability to render a fair and impartial verdict in a proceeding brought by the district attorney, who could evaluate whether to charge her with one or more offenses. See Brooks v. Dretke, 418 F.3d 430 (5th Cir.2005).[1] Accordingly, I would affirm the decision of the court of appeal to grant a hearing.
NOTES
[1] In Brooks, a juror in a capital case, just as the penalty phase was about to begin, was arrested for entering the courthouse with a handgun. The juror's arrest was not revealed to the other jurors but was revealed to the trial judge, who questioned the juror and obtained his assurances that the arrest would in no way impair his ability to render a fair and impartial sentencing verdict. On the defendant's subsequent application for federal habeas corpus relief from his conviction and sentence to death, the appellate court ultimately granted him relief on grounds that the compromising position the juror found himself in for the remainder of the trial supported a finding of implied bias and required setting aside the defendant's conviction and sentence. Brooks, 418 F.3d at 435.